IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WATCHTOWER BIBLE TRACT SOCIETY
OF NEW YORK, INC., et al.,

        Plaintiffs

          v.                   CIVIL NO. 04-1452 (JP)

ROBERTO SÁNCHEZ-RAMOS, et al.,

        Defendants

## OPINION AND ORDER

    Before the Court are several motions for summary judgment, filed by the following parties: (1) Plaintiffs Watchtower Bible and Tract Society of New York and Congregación Cristiana de Testigos de Jehová en Puerto Rico, Inc. (No. 507); (2) Defendants Roberto Sánchez-Ramos, as Secretary of the Department of Justice, Hon. Aníbal Acevedo-Vilá, as Governor of the Commonwealth of Puerto Rico, Ángel D. Rodríguez-Quiñones, as Director of the Planning Board, and Luis A. Vélez-Roche, as Administrator of the Regulations and Permits Administration, in their official capacities (hereinafter the "Commonwealth Defendants") (No. 516); (3) Defendant Municipality of Dorado (No. 518); (4) Defendant Municipality of Trujillo Alto (No. 520); (5) Defendants Municipality of Bayamón, Municipality of

CIVIL NO. 04-1452 (JP)              -2-

Guaynabo, and Municipality of San Juan (No. 527); and (6) Defendant Municipality of Caguas (No. 528).[1]

Also before the Court are the parties' respective responses in opposition to motions for summary judgment.  For the reasons stated herein, Plaintiffs' motion for summary judgment (**No. 507**) is hereby **DENIED,** and Defendants' motions for summary judgment (**Nos. 516, 518, 520, 527, and 528**) are hereby **GRANTED.**

I.   **INTRODUCTION AND BACKGROUND**

Due to the complex procedural history and number of parties involved, the Court will provide a brief overview of the case history.

A.   **The Parties**

Plaintiffs Watchtower Bible and Tract Society of New York (hereinafter "Watchtower") and Congregación Cristiana de Testigos de Jehová en Puerto Rico (hereinafter "Congregación") brought the instant case against Defendants, arguing that Puerto Rico Laws No. 21 and No. 22 (hereinafter the "Controlled Access Laws"), P.R. Laws Ann. tit. 23, §§ 64-64h, violate their rights under the First, Fourth and Fourteenth Amendments of the United States Constitution.  The Controlled Access Laws grant neighborhoods[2] the authority to close

---

1.   In addition, several Defendants have adopted by reference the arguments made by other Defendants in their motions and oppositions.

2.   The gated residential communities involved are commonly referred to in Puerto Rico as "urbanizations."

CIVIL NO. 04-1452 (JP)          -3-

off access to public streets by means of walls and gates.  Plaintiff Watchtower is a corporation utilized by the Governing Body of Jehovah's Witnesses to print and distribute Bible-based books and magazines.  Plaintiff Congregación is a corporation utilized by the Governing Body of Jehovah's Witnesses to, among other things, administer the 327 congregations of Jehovah's Witnesses located throughout the Commonwealth of Puerto Rico.  Plaintiffs allege, in part, that the Controlled Access Laws have impeded their efforts to distribute religious literature and therefore to attract new members.

Defendants are the Commonwealth Defendants; the Municipalities of Bayamón, Caguas, Dorado, Guaynabo, Gurabo, Ponce, San Juan, and Trujillo Alto; and the urbanizations Pacifica Homeowners Association and Villa Paz.  Plaintiffs' amended complaint (No. 49) originally named additional municipalities and urbanizations as Defendants, but, as explained below, several Defendants have been subsequently eliminated from the case.

**B.   Procedural History**

On August 9, 2005, the Court issued an Opinion and Order (No. 29) granting in part and denying in part Defendants' Motion to Dismiss.  The Court dismissed Plaintiffs' constitutional allegations pertaining to the *facial* constitutionality of the Controlled Access Laws.  However, the Court declined to dismiss Plaintiffs' constitutional challenges to the Controlled Access Laws as they are *applied*, holding that to do so would be premature given the

CIVIL NO. 04-1452 (JP)          -4-

undeveloped factual record of the case.  See Antilles Cement Corp.
v. Acevedo Vilá, 408 F.3d 41 (1st Cir. 2005) (Selya, J.).  The Court
also declined to dismiss Plaintiffs' claims under 42 U.S.C.
section 1983 ("Section 1983") for the same reason.  As such,
Plaintiffs' "as applied" claims and Section 1983 claims remain before
the Court, and are the subject of the above-named motions for summary
judgment.

On September 19, 2006, the Court issued another Opinion and
Order (No. 34), this time denying Plaintiffs' motion for leave to
initiate an interlocutory appeal of the Court's dismissal of
Plaintiffs' facial unconstitutionality claims.  In said Opinion and
Order, Plaintiffs were ordered to provide the Court with detailed
information regarding the conditions permitting or preventing access
at the various urbanizations.  The Court further ordered Plaintiffs
to include as defendants in their amended complaint the specific
communities which would be affected by any decision of this Court.

On April 5, 2007, Plaintiffs filed an amended complaint
(No. 49), adding an additional thirty-eight Defendants to the instant
litigation.  Said Defendants are comprised mainly of municipalities
and homeowners' associations.

On January 22, 2008, the Court issued an Opinion and Order
(No. 249) denying several motions to dismiss and one motion for
summary judgment, which were filed by various Defendants.  In its
Opinion, the Court noted, inter alia, that a municipality's

CIVIL NO. 04-1452 (JP)             -5-

delegation of a portion of its authority over public streets to homeowners' associations does not abrogate the municipality's obligation to ensure that public streets remain available for public use.

On April 1, 3, and 4, 2008, three separate Initial Scheduling Conferences were held.  In the Initial Scheduling Conference Order (No. 385), the Court ordered each Defendant urbanization to file, on or before May 19, 2008, a brief history as to the construction of the urbanization.  In particular, the Court ordered each Defendant urbanization to indicate whether the initial construction of the streets in the urbanization was paid for with private or public funding.[3]

On April 21, 2008, the Court issued an Opinion and Order (No. 384) denying a motion for summary judgment filed by Defendant Asociación Comunitaria del Turabo, Inc. ("Turabo").  The Court held that in light of the factual controversy regarding Plaintiffs' ability to access the moving Defendant's urbanization, summary judgment was not appropriate.  Subsequently, Defendant Turabo filed a motion for entry of judgment (No. 378), in which Turabo acknowledged that in the past Plaintiffs had been denied access to

_____

3.   Although five Defendant urbanizations filed informative motions providing the answers to the questions posed by the Court, these five urbanizations are no longer parties to the case.  The responses from the five former Defendant urbanizations that did provide information in response to the Court's Order varied.  Three of the five urbanizations stated or implied in their informative motions (Nos. 415, 416, and 424) that the construction of the streets was paid for with public funds.  Two of the five stated or implied that the streets were originally constructed using private funding (Nos. 422 and 423).

CIVIL NO. 04-1452 (JP)          -6-

the Turabo urbanization, and agreed to be bound by an Order of the Court to provide unfettered access.  The Court granted Turabo's motion for entry of judgment on May 15, 2008 (No. 419).

On May 30, 2008, the Court issued an Opinion and Order (No. 446) granting motions by several Defendant urbanizations for entry of judgment stating that Plaintiffs shall have unfettered access to the moving Defendants' urbanizations.  Specifically, the Court ordered that:

> Plaintiffs shall have unfettered access to the following Defendant Urbanizations: . . . Said access shall not be restricted by the guard into the urbanization, but each individual resident shall have the right to refuse entry of Plaintiffs into his or her individual home.  Failure by said Defendant Urbanizations to adhere to this Order will be grounds for contempt.

The Court further held that the moving Defendants' agreement to the unfettered access language mooted the controversy involving those urbanization Defendants.  Accordingly, the Court dismissed said Defendants.  On July 9, 2008 and August 8, 2008, the Court entered two further Opinions (Nos. 465 and 468), in which additional urbanizations were dismissed after agreeing to be bound by the unfettered access language.

On June 9, 2008, the Court entered a Default Judgment (No. 455) for Plaintiffs against several Defendant municipalities and urbanizations that had failed to answer Plaintiffs' complaint.  The Court deemed the defaulting Defendants to have admitted the allegations of Plaintiffs' amended complaint.  The Court also ordered

CIVIL NO. 04-1452 (JP)          -7-

the defaulting urbanizations to provide the Plaintiffs unfettered access to their urbanizations, and ordered the defaulting municipalities to provide the Plaintiffs unfettered access to urbanizations within their jurisdiction.

Presently, the Defendants remaining in the case are the Commonwealth Defendants; the Municipalities of Bayamón, Caguas, Dorado, Guaynabo, Gurabo, Ponce, San Juan, and Trujillo Alto; and the urbanizations Pacifica Homeowners Association and Villa Paz.

## II.  MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following material facts were deemed uncontested by all parties at the Initial Scheduling Conferences on April 1, 3, and 4, 2008 (No. 385).

1.  Watchtower is a corporation utilized by the Governing Body of Jehovah's Witnesses to print and distribute Bible-based books and magazines.

2.  The Governing Body is an ecclesiastical group of elders who provide spiritual direction to Jehovah's Witnesses worldwide.

3.  Since 1909, Watchtower has been the publisher of numerous Bibles, tracts, magazines, booklets, and books, including the semimonthly magazines entitled The Watchtower and Awake!, all of which are distributed throughout the United States, including Puerto Rico, and elsewhere.

CIVIL NO. 04-1452 (JP)              -8-

4.   Jehovah's Witnesses use the Bible along with religious publications produced by Watchtower to personally discuss with their neighbors the wonderful promises recorded by God in the Bible.

5.   Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc., is a corporation utilized by the Governing Body of Jehovah's Witnesses, among other things, to administer to the 318 congregations of Jehovah's Witnesses located throughout the Commonwealth of Puerto Rico.

6.   As part of their ministry, Jehovah's Witnesses, including those in Puerto Rico, offer home Bible studies and religious literature without cost.

7.   On May 20, 1987, the Puerto Rico Legislature passed Law No. 21, "empowering residential associations with the ability to close off their neighborhoods to outsiders." Figueroa v. Fernández, 921 F. Supp. 889, 892 (D.P.R. 1996).  Authority was granted to close off access to public streets in neighborhoods by means of walls and gates. On July 16, 1992, the Puerto Rico Legislature passed Law No. 22, amending portions of Law No. 21.

8.   On April 30, 1997, local representatives of those administering the activities of Jehovah's Witnesses in

CIVIL NO. 04-1452 (JP)          -9-

    Puerto Rico testified before the Commission for Municipal Affairs of the House of Representatives.

9.    In some urbanizations, Jehovah's Witnesses can obtain access through a pedestrian gate.

10.    The Municipality of Caguas is a municipality of the Commonwealth of Puerto Rico organized and existing pursuant to the Autonomous Municipalities Law, Title 21, Puerto Rico Laws Annotated, sec. 4001 *et seq*.

11.    The Municipality of Caguas has issued ordinances adopting regulations governing controlled access to neighborhoods, pursuant to the Controlled Access Laws.

12.    The Municipality of San Juan is a municipality in the Commonwealth of Puerto Rico, organized and existing pursuant to the Autonomous Municipalities Law, Title 21, Puerto Rico Laws Annotated, sec. 4001 *et seq*.

13.    The Municipality of Bayamón is an entity, as set forth by the laws of the Commonwealth of Puerto Rico, that has the legal capacity to sue and to be sued.

14.    The Controlled Access Laws grant municipalities the authority to issue authorizations or permits for control of streets, urbanizations or communities under the circumstances described in the Laws, and the Municipality of Bayamón has issued authorizations in compliance with said Laws.

CIVIL NO. 04-1452 (JP)          -10-

15.  Pacifica is duly-organized and registered in the Puerto
     Rico Department of State as a nonprofit institution and
     has its principal place of business in Trujillo Alto,
     Puerto Rico.

16.  Pacifica is a controlled access community.

17.  The Municipality of Ponce is a municipality of the
     Commonwealth of Puerto Rico, organized and existing
     pursuant to the Autonomous Municipalities Law, Title 21,
     Puerto Rico Laws Annotated, sec. 4001 *et seq*. The
     Municipality of Ponce adopted ordinance No. 103 of
     April 10, 1996, superseded by No. 45 of May 14, 2003,
     adopting regulations governing controlled access to
     neighborhoods, pursuant to the Controlled Access Laws.

18.  The Municipality of Trujillo Alto is a municipality in the
     Commonwealth of Puerto Rico.

19.  The Municipality of Trujillo Alto, in accordance with
     Planning Regulation No. 20, enacted a Municipal Ordinance
     that created the Technical Committee which evaluates the
     permits for gates. Said evaluations are done pursuant to
     the Controlled Access Laws.

20.  The Municipality of Gurabo is a municipality in the
     Commonwealth of Puerto Rico, organized and existing
     pursuant to Law 81 of August 30, 1991, as amended.

CIVIL NO. 04-1452 (JP)          -11-

The parties have submitted over nine hundred additional facts in connection with the motions for summary judgment and oppositions thereto.  The Court takes this opportunity to remind the parties of the language of Local Rule 56:

> . . . (b) Supporting Statement of Material Facts
> A motion for summary judgment shall be supported by a separate, **short, and concise** statement of material facts, set forth in numbered paragraphs . . .
>
> (c) Opposing Statement of Material Facts
>
> A party opposing a motion for summary judgment shall submit with its opposition a separate, **short, and concise** statement of material facts . . . .

(emphasis added).  While the present case is complex and warrants development of a thorough factual record, in at least some instances the parties' statements of facts could not be described as short and concise.  Nevertheless, the Court has reviewed the full record and will give well-supported facts due attention in the following analysis.

In the interest of conciseness, the Court will not list here each fact deemed admitted as a result of stipulation or clear support in the record.  However, in order to provide further context regarding facts of the case, the Court will list a brief selection of facts.  The Court emphasizes that the facts listed here are not the full scope of facts deemed admitted and considered by the Court.  Nor are the following facts intended to be perfectly representative of the broader factual record.  The following are intended as

CIVIL NO. 04-1452 (JP)          -12-

examples only to provide familiarity with some of the relevant
factual context:

1.   Under P.R. Laws Ann. tit. 23, § 64, municipalities have
     authority to issue authorizations or permits for access
     control of streets, urbanizations or communities under the
     circumstances described in such statute and the
     Municipality of Bayamón has issued such authorizations or
     permits in compliance with those statutory provisions.
     (Bayamón SOF #7.)

2.   When a permit request is received, the Municipality of
     Bayamón opens a file for the urbanization, and keeps the
     file for the life of the urbanization.  Approximately one
     hundred such files exist for approved or pending
     controlled access permits in Bayamón.  The majority of
     these files pertain to urbanizations who have completed
     the request process and received an approved permit.
     (Santana-del Pilar Dep. at 6-7, Oct. 21, 2008; Pl.'s Opp.
     to Bayamón SOF #7.)

3.   The municipalities' power to grant controlled access
     permits is subject to oversight by Commonwealth officials.
     The Planning Board of the Commonwealth of Puerto Rico
     ("Planning Board") is empowered, by regulation adopted by
     the Governor of the Commonwealth, to adopt rules regarding

CIVIL NO. 04-1452 (JP)            -13-

the procedure for granting controlled access permits. (Commonwealth Def.'s SOF #21-26.)

4.    The Commonwealth Administration of Regulation and Permits administers applicable regulations of the Planning Board regarding permits, but does not provide instructions or guidelines to municipalities and/or urbanizations dealing with the administration, implementation, and/or enforcement of the Controlled Access Laws. (Commonwealth Def.'s SOF #27-30.)

5.    At the urbanization of Valles del Lago, in the Municipality of Caguas, Jehovah's Witnesses have been excluded by the security guard. On one such occasion, the urbanization security guard contacted the municipal police, who arrived and sought to convince the Jehovah's Witnesses to cease their preaching activities and take up the issue with the urbanization board of residents. (Caguas SOF #46-48.)

6.    On two different occasions one of Jehovah's Witnesses was issued a citation for engaging in their ministry in a controlled access community in Caguas. (Pl.'s Opp. to Caguas SOF, Add'l Fact #2.)

7.    At the urbanization of Estancias de Bairoa in the Municipality of Caguas, Jehovah's Witnesses are permitted

CIVIL NO. 04-1452 (JP)          -14-

      access to preach during one or two hours per week. (Caguas SOF #42-43.)

8.    In 2007, Plaintiffs conducted an island-wide survey and recorded data indicating how many of the urbanizations within each municipality permit some form of access to Jehovah's Witnesses.  (Pl.'s Ex. 2.)

9.    The 2007 access control survey indicates that eight out of twelve total urbanizations within the Municipality of Dorado do not permit access to Jehovah's Witnesses.  The survey also indicates that twenty-nine out of thirty-three urbanizations within the Municipality of Trujillo Alto do not permit access to Jehovah's Witnesses.  Id.

10.    The Commonwealth Defendants have no mechanisms in place to address complaints by an individual being denied access to public streets within a controlled access community. (Commonwealth Def.'s Mot. Summ. J. at 516; Pl.'s Opp. to Commonwealth Def.'s SOF, Add'l Fact #8.)

11.    On several occasions, Commonwealth police have participated in enforcing the exclusion of Jehovah's Witnesses from controlled access communities. (Pl.'s Opp. to Commonwealth Def.'s SOF, Add'l Facts #9-17.)

12.    Defendant Pacifica does not admit visitors seeking to speak with residents or distribute printed materials, unless the visitor specifically arranges authorization

CIVIL NO. 04-1452 (JP)          -15-

       from a resident.  (Colón Resto Dep. 17:1 - 17:13, July 15, 2008) (No. 503).

## III.  <u>LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT</u>

Summary judgment serves to assess the proof to determine if there is a genuine need for trial.  <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990).  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Zambrana-Marrero v. Suárez-Cruz</u>, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1116 (1st Cir. 1993); <u>Canal Ins. Co. v. Benner</u>, 980 F.2d 23, 25 (1st Cir. 1992).  The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In this way, a fact

CIVIL NO. 04-1452 (JP)          -16-

is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L. Ed. 2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Goldman, 985 F.2d at 1116.

**IV.   ANALYSIS**

Plaintiffs move for summary judgment arguing that there is no issue of material fact as to the unconstitutionality of the Controlled Access laws as they are applied to Plaintiffs by Defendants. Plaintiffs' as applied claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as enforced through Section 1983. Plaintiffs argue that the record shows violations of their freedoms of speech, press, exercise of

CIVIL NO. 04-1452 (JP)          -17-

religion, and association, as well as their rights of due process, equal protection, and to be free from unreasonable seizure.

Defendants move for summary judgment arguing that the record shows, without any genuine issue of material fact, that Defendants' application of the Controlled Access Laws to Plaintiffs is constitutional.  Several of the Defendant municipalities also raise defenses arguing that Plaintiffs lack standing, and that Plaintiffs' claims have become moot and are barred by the applicable statute of limitations.  The Court will now consider the parties' arguments in turn.  Because the parties' respective motions and oppositions involve the same issues, the Court considers them together.

**A.   Plaintiffs' Freedom of Speech, Press, and Exercise of Religion Claims (First & Fourteenth Amendments)**

In their cross motions for summary judgment, the parties dispute whether the record shows violations of Plaintiffs' First Amendment rights to freedom of speech, press, and exercise of religion.  The Court will analyze these three First Amendment claims together, as has been done by the United States Supreme Court in cases involving multiple related First Amendment Claims.[4]  We shall begin by laying out the applicable standard of scrutiny that emerges from cases dealing with the freedoms of speech, press, and exercise of religion.

_____

4.   See Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton, 536 U.S. 150 (2002) (analyzing jointly plaintiffs' claims regarding speech, press, and exercise of religion).  The Court will separately consider Plaintiffs' freedom of association claim in a subsequent section.

CIVIL NO. 04-1452 (JP)          -18-

A statute that imposes content-neutral restrictions on speech is subject to intermediate scrutiny under the First Amendment. Asociación de Educación Privada de Puerto Rico, Inc., v. García-Padilla, 490 F.3d 1, 15-16 (1st Cir. 2007). Under intermediate scrutiny, the "government may impose reasonable restrictions on the time, place, or manner of protected speech provided the restrictions . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication." Id. (internal quotations omitted). The statute need not utilize the least restrictive means possible to achieve the governmental interest. Rather, a statute is sufficiently narrowly tailored if the means chosen are not substantially broader than necessary to achieve the government interest.[5]  Id.

As with restrictions on speech, a content-neutral restriction on free press is subject to intermediate scrutiny. Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 186 (1st Cir. 1996). As such, any restriction on the press must be

---

5.    The precise formulation of the test applicable to content-neutral regulations of speech has come into some question following the decision of the United States Supreme Court in Village of Stratton, 536 U.S. 150, 175 ("It is unclear what test the Court is applying . . .") (Rehnquist, C.J., dissenting). Following the lead of the United States Court of Appeals for the First Circuit, we will continue to apply the conventional formulation of the intermediate scrutiny standard articulated in Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) and applied by the First Circuit in García-Padilla, which requires that the statute in question be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication." García-Padilla 490 F.3d at 15-16.

CIVIL NO. 04-1452 (JP)          -19-

"narrowly tailored to serve a significant governmental interest, and allow for reasonable alternative channels of communication." <u>Id.</u> The law will be valid if it does not burden substantially more expression than is necessary to further the government interest. <u>Id.</u>

The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  The First Amendment applies to the states through the Fourteenth Amendment. <u>School Dist. of Abington Tp., Pa. v. Schempp</u>, 374 U.S. 203 (1963). The right to espouse the religious beliefs of one's own choosing carries with it the right to engage in proselytization to disseminate religious teachings and seek converts to join a particular faith. <u>Cantwell v. State of Connecticut</u>, 310 U.S. 296, 304 (1940).  The right to free exercise of religion is not absolute, and may be restricted by regulations on the time, place, and manner of the actions.  <u>Id.</u>

In applying the First Amendment standards articulated by the Supreme Court, the Court must also consider other democratic concepts enclosing the nature of man and his inherent rights.  These concepts are included in that great writing that is the Constitution of the United States, which provides for equal protection of the law, and further acknowledges that the rights of one end where the rights of another begin.

CIVIL NO. 04-1452 (JP)          -20-

> **1.  *Restriction on Speech, Press, and Exercise of Religion Allegedly Caused by Controlled Access Laws as Applied to Plaintiffs.***

As to the first element – restrictiveness – in Plaintiffs' speech, press and free exercise claims, the factual record before the Court indicates that, as applied to Plaintiffs, the Controlled Access Laws do create some limited restriction on the speech and other First Amendment freedoms of Jehovah's Witnesses by preventing them from accessing the streets of residential communities throughout Puerto Rico.  The extent of the restrictions vary across the different municipalities and the various urbanizations within each municipality. Plaintiffs' 2007 survey of the access control policies in Puerto Rico, as applied to Jehovah's Witnesses, indicates that many of the urbanizations on the island do not permit Jehovah's Witnesses to enter and engage in speech, distribution of literature, or proselytization.

To provide a specific example, the record indicates that the Defendant urbanization of Pacifica does not admit individuals seeking to engage in protected speech unless the visitor specifically coordinates entry with a particular resident.  The following statements were made at the deposition of Luis Colón Resto, a member of the Pacifica Homeowners Association who is responsible for working with the private security company at the urbanization:

> Q: So if a person appeared at the gate of Pacifica and said they wanted to go from door to door to speak about

CIVIL NO. 04-1452 (JP)            -21-

> politics, would they be given access to the streets of
> Pacifica?
>
> A: No.
>
> Q: If a person appeared at the gate and said they wanted
> to go from door to door to speak about a religious
> message, would they be given access to the streets of
> Pacifica?
>
> A: No . . . . You have to go specifically to a residence
> and that person authorize it.

(Colón Resto Dep. 17:1 - 17:13, July 15, 2008) (No. 503). As
indicated by the examples of the access control survey and the Colón
Resto deposition, the evidentiary record reveals that the Controlled
Access Laws, as applied to Plaintiffs, have resulted in certain
limited restrictions on Plaintiffs' speech, press, and religious
activities.

### 2.   *Significant Government Interest*

As to the second element of the intermediate scrutiny standard,
the Controlled Access Laws are designed to further the important
government interest of preventing crime. In the statement of motives
regarding the 1992 amendments to the Controlled Access Laws, the
Puerto Rico Legislature stated:

> Access control systems permit the effective involvement of
> the community to help the Government in its fight against
> crime, which is still experiencing an excessive and
> alarming increase in spite of the multiple efforts
> expended by the Puerto Rico Police to provide the security
> and protection which every citizen is entitled to. In this
> manner the community participates actively and effectively
> in its own protection, allowing the resources of the
> Puerto Rico Police to be used adequately in high crime
> areas.

CIVIL NO. 04-1452 (JP)          -22-

Statement of Motives, Act No. 22, July 16, 1992, P.R. Laws Ann.
tit. 23, § 64.  Allowing unfettered access to residential communities
creates a heightened risk that criminals seeking to commit a robbery
or other offense may freely enter disguised as religious personnel
or otherwise.

Puerto Rico faces  unusually severe problems with violent crime.
For example, as of 2005, the murder rate in Puerto Rico was the
highest in the United States.[6]  Within the first two months of 2009,
119 murders were reported in Puerto Rico.[7]  By July 2009, police
statistics recorded 433 murders in Puerto Rico, thirty-three more
than during the same period of the preceding year.[8]  The Court takes
judicial notice of said statistics.  These grim numbers have prompted
Governor and accomplished attorney Luis Fortuño to state "[t]he
pointless deaths that have been occurring in Puerto Rico in recent
weeks have wounded the feelings of all Puerto Ricans, and we all must
be part of the fight against crime."[9]

Statistics of this sort understandably lead the Puerto Rico
legislature to view protecting its citizens from violence as a

---

6.  Taína Rosa, *Detaining Crime in Puerto Rico*, Caribbean Business, January 20, 2005 at 16.

7.  *Violent Deaths Continue*, El Nuevo Día, February 24, 2009, *accessed on February 24, 2009 at* http://www.elnuevodia.com/diario/noticia/puertoricohoy /noticias/continuan_las_muertes_violentas/537072.

8.  Cynthia López-Cabán, *"We Must be Part of the Fight,"* El Nuevo Día, July 3, 2009, at 14.

9.  Id. (Court's translation).

CIVIL NO. 04-1452 (JP)          -23-

central concern.  See Figueroa v. Fernandez, 921 F. Supp. 889 (D.P.R. 1996) (describing the motivation for the Controlled Access Laws as follows: "[a]ppalled by the skyrocketing number of murders, assaults, and robberies, the Puerto Rico Legislature decided to arm its citizens with a weapon against crime."). In light of these facts, the Court finds that preventing crime in residential areas is a significant government interest.

In addition, the Controlled Access Laws further the important government interest of preserving residents' privacy rights. As residential communities in Puerto Rico and throughout the world have evolved and adapted to new circumstances, innovative approaches for ensuring rights of privacy have become necessary. The residential structures enabled by the Controlled Access Laws are an important example of this type of adaptation. Organizing into such new types of community living arrangements allows for stable communities that can overcome the challenges posed by population increases, which are particularly severe in Puerto Rico. Forcing proselytization upon the residents of these communities is counterproductive to the rights of all the parties involved in this controversy. The Court thus finds that the government has an important interest in allowing residents of controlled access communities to be free from undue annoyance and intrusion upon their homes, and in protecting residents' legal rights to control who intrudes upon their properties.

CIVIL NO. 04-1452 (JP)          -24-

### 3.   *Narrowly Tailored*

The third element in the intermediate scrutiny standard requires that when a content-neutral state law has the effect of restricting speech, the means chosen must not be "substantially broader than necessary to achieve the government interest." García-Padilla 490 F.3d at 16.  Narrow tailoring does not require the state to use the least restrictive means possible to achieve the governmental interest.  Rather, a statute is sufficiently narrowly tailored if the means chosen are not substantially broader than necessary to achieve the government interest.  Id.

Here, the significant government interests involved are prevention of crime and protection of privacy rights.  Under the Controlled Access Laws, the means utilized to achieve these goals is a system of allowing communities to set up gates or security checkpoints where entry is limited to those who live in the community and to guests whom a resident has chosen to admit.  This approach focuses squarely on the interests of crime prevention and privacy by setting up a mechanism to stop potential burglars or other criminals, and to prevent homeowners from having to personally defend their private property.

The means utilized with the Controlled Access Laws sometimes have a minimal effect of preventing Jehovah's Witnesses from proselytizing in certain residential communities.  However, this cannot reasonably be avoided without sacrificing safety and privacy.

CIVIL NO. 04-1452 (JP)              -25-

The Controlled Access Laws allow residents to decide whether or not to admit a potential visitor.  Therefore individuals, including Jehovah's Witnesses, who wish to speak with a resident may still do so if the resident is willing.[10]   In this manner, the laws accommodate both the rights of religious groups and the rights of citizens living in residential communities.

A clear example of the successful functioning of this type of balanced approach is the process followed by Defendant urbanization of Pacifica.  As explained by Pacifica representative Luis Colón Resto in his deposition, any visitor seeking to enter Pacifica, whether to discuss religion or another topic such as politics, must first obtain the approval of an individual resident.  (Colón Resto Dep. 17:1 - 17:13, July 15, 2008) (No. 503).  Once such approval is obtained, the security guard at the gate will permit the visitor to enter and go to the resident's home.  No further restrictions are placed on the visitor once he is inside the urbanization.  The Court finds that Pacifica's practice of permitting entry after receiving approval strikes a beneficial balance that preserves First Amendment rights without unnecessarily burdening residents.  The Court further notes that Plaintiffs' dissatisfaction with the urbanizations' fair and balanced policies indicates Plaintiffs' intent to misuse their

---

10.    This feature of the Controlled Access Laws distinguishes the present case from the situation in <u>Village of Stratton</u>, 536 U.S. at 150.  In that case, the law in question prohibited all canvassing without a permit.  By contrast, here an individual seeking to speak with a resident can still do so, even without a permit, as long as the resident gives specific prior approval.

CIVIL NO. 04-1452 (JP)          -26-

economic strength by litigating in the hopes of obtaining favorable Supreme Court jurisprudence.

By contrast with Defendant Pacifica's practice, certain urbanizations in Puerto Rico maintain locked pedestrian gates at which no security guard is present to permit entry for approved visitors.[11]  Thus, only residents can open the gates with their keys or entry codes.  While this practice may be necessary at times to preserve residents' safety, the Court finds that the absence of a guard may place an increased burden on visitors seeking to speak with residents.  Without a guard to call from the gate to a resident's home, visitors face the increased burden of needing to coordinate with a resident who can come from their home to the gate to permit entry.  The Court therefore notes that the use of guarded entryways, such as those at the Pacifica urbanization, is preferable to unmanned locked gates.  Although the presence of a closed gate lacking a guard imposes a greater burden on visitors seeking to speak with residents, such an approach does not rise to the level of being unconstitutionally burdensome.  Jehovah's Witnesses or other visitors may still enter such urbanizations if they coordinate with a resident prior to their arrival.  The necessity of advanced planning does not

---

11.    For example, the Municipality of Guaynabo contains certain urbanizations where entryways are blocked by locked gates without a security guard.  As stated by Angel Rafael Albizu-Merced, an attorney working in the administration of Guaynabo, "I understand that there are some small areas, small housing developments that do not have a guard house with a security guard taking care of those coming in and out."  (Albizu-Merced Dep. 18:21 - 19:2, June 11, 2008) (No. 502).

CIVIL NO. 04-1452 (JP)          -27-

negate the constitutionality of these urbanizations' method for implementing the Controlled Access Laws.  In addition, as discussed further in the following section, individuals are free to communicate with residents of such communities via numerous alternative means of communication such as mail, email, or direct contact immediately outside the urbanization gates.

Because the Controlled Access Laws are carefully formulated to achieve the important government interests of crime prevention and preserving residents' privacy, the Court finds that said laws are sufficiently narrowly tailored to further the relevant government interests.  Globe Newspaper Co. 100 F.3d at 188-189 (finding law prohibiting newspaper distribution boxes on streets of historic city area to be sufficiently narrowly tailored to achieve government interest in preserving aesthetics of historic zone).

### 4.    *Alternative Channels of Communication*

The final step in the intermediate scrutiny analysis is to examine whether the law in question leaves open ample alternative channels of communication.  Here, the factual record does not reveal any evidence that the Controlled Access Laws, as they are applied to Plaintiffs, have a negative affect on the ability of Jehovah's Witnesses to utilize alternative means of communication to reach new members.  Religious messages may be distributed using the mail or electronic mail, telephone, television, radio, billboards, and various other means.   These other channels besides personal

CIVIL NO. 04-1452 (JP)          -28-

communication remain open and available to Plaintiffs.  In addition, Jehovah's Witnesses remain free to speak directly with residents on public streets outside the urbanization gates.  Therefore, the Court finds that the Controlled Access Laws, as applied, satisfy the constitutional requirement for leaving open alternative channels of communication.

     A careful examination of the record reveals no genuine factual issues that could support a conclusion that the Controlled Access Laws, as applied to Plaintiffs, could in any way infringe upon Plaintiffs' First Amendment rights to freedom of speech, expression, and exercise of religion.  Defendants have demonstrated significant government interests in crime prevention and privacy, and have shown that the laws are narrowly tailored to achieve these goals without affecting Plaintiffs' rights of expression in any way and while leaving open alternative channels of communication.  The Court emphasizes that the balance struck by the Controlled Access Laws is appropriate given that ours is not an anarchist society, but rather one of law and order.  Accordingly, the Court will grant summary judgment for Defendants on these claims.

> **B.   Plaintiffs' Freedom of Association Claims (First & Fourteenth Amendments)**

     Plaintiffs bring a claim for violation of their First Amendment right to freedom of association, resulting from the Controlled Access Laws as applied to Jehovah's Witnesses.  Defendants move for summary

CIVIL NO. 04-1452 (JP)          -29-

judgment on this claim, arguing that Plaintiffs have developed insufficient evidence to create a genuine issue as to any material fact that could support Plaintiffs' freedom of association claim.

Though not explicitly mentioned in the First Amendment, the United States Supreme Court has recognized a constitutional right to freedom of association. NAACP v. State of Ala., ex rel. Patterson, 357 U.S. 449 (1958). The right of association includes two distinct freedoms: (1) freedom of intimate association, and (2) freedom of expressive association. Roberts v. United States Jaycees, 468 U.S. 609 (1984). Freedom of expressive association refers to the right of individuals to associate for the purposes of engaging in activities protected by the First Amendment such as speech, assembly, and exercise of religion. Id. Freedom to associate for the purposes of engaging in speech and other activities protected by the First Amendment includes various forms of association, including both traditional meetings to organize and further the group's interests, as well as other forms of association such as social events and fundraisers. Gay Students Organization of University of New Hampshire v. Bonner, 509 F.2d 652, 660 (1st Cir. 1974).

The factual record developed by the parties during discovery has failed to yield evidence indicating that Plaintiffs are being denied the freedom of association as a result of the Controlled Access Laws. Plaintiffs have shown that individuals representing the Jehovah's Witnesses have been denied access to certain urbanizations in Puerto

CIVIL NO. 04-1452 (JP)          -30-

Rico.  However, the excluded individuals sought permission only to visit non-members' homes to discuss the religious views of Jehovah's Witnesses.  Thus, the intended activities within the urbanizations are not examples of association of the religious group.  There is no evidence on the record demonstrating that Plaintiffs are attempting to gather together in group meetings of Jehovah's Witnesses, or to hold social events or fundraisers like in <u>Bonner</u>.  <u>Id.</u>  Because the record indicates no genuine factual issue as to the possibility that the constitutional right to expressive association has been infringed by the Controlled Access Laws as applied to Plaintiffs, the Court will grant summary judgment for Defendants on this claim.

### C.   <u>Plaintiffs' Unreasonable Seizure Claims (Fourth & Fourteenth Amendments)</u>

Plaintiffs allege that the application of the Controlled Access Laws by Defendants has violated their rights to be free from unreasonable seizure, as established in the Fourth Amendment and applicable to the states through the Fourteenth Amendment. Plaintiffs assert that Jehovah's Witnesses are subjected to seizures upon being stopped at the checkpoints for entering controlled access urbanizations.  Defendants argue that Plaintiffs' Fourth Amendment unreasonable seizure claim must be dismissed because the record indicates, beyond any genuine factual question, that Plaintiffs right to be free from unreasonable seizure has not been infringed.

CIVIL NO. 04-1452 (JP)          -31-

The Fourth Amendment guarantees the rights of citizens to be free from unreasonable searches and seizures, and requires a two-part test to determine whether this right has been abridged.  First, the Plaintiff must show that a search or seizure has occurred.  A person is deemed to have been "seized" by police or other authorities if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980); United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008).

Second, if a seizure has occurred, it will constitute a Fourth Amendment violation only if the seizure is unreasonable.  In the context of a fixed vehicle checkpoint, reasonableness is determined by balancing "the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 449-450 (1990) (quoting Treasury Employees v. Von Raab, 489 U.S. 656, 665-666 (1989)); United States v. Woodrum, 202 F.3d 1, 11 (1st Cir. 2000).

### 1.   *Existence of Seizure*

Plaintiffs contend that being stopped by a security guard at the entrance to an urbanization constitutes an unreasonable seizure. Upon approaching a gated urbanization entrance manned by a security guard, drivers may be prevented from entering unless they first stop

CIVIL NO. 04-1452 (JP)          -32-

and answer questions from the guard.  Nothing about this scenario suggests that a reasonable person would believe that he was not free to leave.  Potential visitors, including Jehovah's Witnesses, know that at any point they could choose to terminate the conversation with the security guard and leave the urbanization.  Plaintiffs have not developed and argued facts in their motion for summary judgment, or in their opposition to Defendants' motions for summary judgment, to indicate that guards have in practice detained individuals in a way that prevents them from feeling free to leave.  Therefore, the Court concludes that the Controlled Access Laws, as applied to Plaintiffs, do not result in a seizure for Fourth Amendment purposes. Mendenhall, 446 U.S. at 554; Ford, 548 F.3d at 4.  Accordingly, the Court will grant summary judgment for Defendants on Plaintiffs' Fourth Amendment claims pertaining to the Controlled Access Laws as applied to Plaintiffs.

### 2. Reasonableness

Because the facts do not support a finding that a seizure has occurred, we need not proceed to the second step of the analysis, under which a plaintiff must show that the seizure was unreasonable. Nevertheless, the Court will briefly address the reasonableness of stopping visitors entering urbanizations.  Applying the Supreme Court's test in Sitz, the reasonableness of the vehicle stops must be determined by balancing the individual's privacy expectations against the Government's interests.  Sitz, 496 U.S. at 449-450.

CIVIL NO. 04-1452 (JP)          -33-

Here, the intrusion on visitors' privacy is nonexistent.  By contrast with a police stop on a highway, urbanization security guards do not ask to see the driver's license or registration, or subject drivers to tests to detect intoxication.  Instead, the guards merely ask questions such as the purpose of the visit, the name of the resident to be visited, and the name of the visitor.  Such questions are asked in a context creating a low expectation of privacy – visitors are outside in a public area and affirmatively choosing to approach an entrance gate or checkpoint.

On the other hand, the government interests achieved by this brief stop are significant.  Serious dangers such as burglary or violent crime against residents may be prevented by the brief stops at urbanization gates.  Such stops allow guards to identify by sight visitors who have previously committed crimes in the urbanization, and deter new offenders who are aware that at least one witness will have noted their entrance around the time of a burglary or other offense.  Thus, even if the conversations at checkpoints constituted a seizure, which they do not, we also note that the evidence does not support a finding of unreasonableness.  Sitz, 496 U.S. at 455 (finding intrusion caused by automobile checkpoint stops to be warranted in light of dangers caused by drunk drivers).  Accordingly, the Court shall grant summary judgment for Defendants on Plaintiffs' claim of unreasonable seizure resulting from the application of the Controlled Access Laws.

CIVIL NO. 04-1452 (JP)          -34-

   **D.   <u>Plaintiffs' Right to Travel and Freedom of Movement Claims</u>**

   Plaintiffs claim that Defendants' application of the Controlled Access Laws has infringed upon their constitutionally protected right to travel and freedom of movement, by preventing Jehovah's Witnesses from moving freely within closed urbanizations.  Defendants move for summary judgment on this claim, arguing that the record creates no genuine issue of material fact to support the possibility that Plaintiffs' have suffered a violation of the right to travel.

   The United States Supreme Court has established that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."  <u>Kent v. Dulles</u>, 357 U.S. 116, 125 (1958).  The Fourteenth Amendment provides the same protection for "liberty" against infringement by the states.  The  right to travel is not absolute, and may be curtailed on the basis of important government interests.  <u>Regan v. Wald</u> 468, U.S. 222, 243 (1984) (upholding restrictions on travel to Cuba based on national security concerns).  The right to travel applies to international travel and to interstate travel.  <u>Kent</u>, 357 U.S. at 125 (upholding right to international travel); <u>United States v. Guest</u> 383 U.S. 745 (1966) (upholding right to interstate travel).  Neither the United States Supreme Court nor the First Circuit has clearly established whether the right to travel also applies to intrastate travel.  <u>Compare</u> <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. 263, 277 ("a purely intrastate

CIVIL NO. 04-1452 (JP)            -35-

restriction does not implicate the right of interstate travel") <u>with</u> <u>Id.</u> at 333 (finding the majority's position regarding impact on intrastate travel "unsupported by precedent or reason") (Stevens, J., dissenting).

The Controlled Access Laws are local in nature, and have no affect on international or interstate travel.  To the extent that a right to intrastate travel exists, the Controlled Access Laws also do not infringe on that right.  Indeed, the statutes specifically include qualifications providing that they may not be used to cut off a thoroughfare when no alternative means of reaching a particular destination is available.  P.R. Laws Ann. tit. 23, § 64.  The record does not reveal facts creating a genuine issue as to the possibility that the Controlled Access Laws have resulted in an infringement on Plaintiffs' right to travel.  Accordingly, the Court will grant summary judgment for Defendants on Plaintiffs' as applied right to travel claim.

**E.   Plaintiffs' Due Process and Equal Protection Claims (Fourteenth Amendment)**

Plaintiffs' amended complaint (No. 49) alleges that Defendants' application of the Controlled Access Laws to Jehovah's Witnesses has violated Plaintiffs' rights of due process and equal protection.  In the absence of argumentation from Plaintiffs to suggest otherwise, the Court understands Plaintiffs' invocation of the Fourteenth Amendment to refer to the means by which rights provided by the First

CIVIL NO. 04-1452 (JP)          -36-

and Fourth Amendments may be applied to the states.  Nevertheless, in order to provide a complete review of the claims alleged, the Court will examine the potential Fourteenth Amendment claims that Plaintiffs may be asserting independent of the First and Fourth Amendments.  The Court notes with regard to the following analysis that the Controlled Access Laws are in no way directed specifically at Jehovah's Witnesses, as the language of said laws is general with regard to the affected individuals.

### 1.   *Due Process*

Plaintiffs allege that Defendants' application of the Controlled Access Laws to Jehovah's Witnesses has violated the constitutional protection of due process.  Defendants move for summary judgment on this claim.  The due process clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  The Fourteenth Amendment due process clause includes both a substantive due process right and a procedural due process right. Harrah Independent School Dist. v. Martin, 440 U.S. 194 (1979).

### i.   *Substantive Due Process*

Substantive due process creates two categories of rights: (1) incorporation of most of the protections from the Bill of Rights, thus causing those limits on congressional activity to be applicable also to state legislatures, and (2) a more general protection against certain arbitrary, wrongful government actions.  Jeneski v. City of

CIVIL NO. 04-1452 (JP)          -37-

Worcester, 476 F.3d 14, 17 (1st Cir. 2007).  With regard to the first category of substantive due process rights, we have already addressed Plaintiffs' particular claims based on the First and Fourth Amendments in the corresponding sections of our analysis dealing with freedom of speech, press, religion, association, and travel.

With regard to the second category of substantive due process rights, a general substantive due process claim may be made only when the state's action "shocks the conscience."  Cruz-Ezaro v. Rivera-Montañez, 212 F.3d 617, 622 (1st Cir. 2000).  State action is said to shock the conscience in situations such as those where the action is "arbitrary or capricious," "run[s] counter to the concept of ordered liberty," or "violate[s] . . . universal standards of decency."  Id. (internal quotations omitted).  Here, Plaintiffs argue that the Controlled Access Laws have gone too far in tipping the difficult balance between residents' rights to privacy and safety and Plaintiffs' rights to freedom of expression and religion.  Plaintiffs have not developed facts to support the notion that the Defendant urbanizations, municipalities, or Commonwealth officials have taken such extreme action so as to shock the conscience.  Thus, Plaintiffs have no claim under a theory of generalized substantive due process. Id.

### 2.  Procedural Due Process

In order to succeed on a procedural due process claim, a plaintiff must demonstrate that he or she was deprived of a life,

CIVIL NO. 04-1452 (JP)          -38-

liberty, or property interest without the requisite minimum measure of procedural protection warranted under the circumstances. <u>Romero-Barceló v. Hernández-Agosto</u>, 75 F.3d 23, 32 (1st Cir. 1996).

In the case at bar, Plaintiffs have not described a property interest of which they have been deprived.  With regard to an alleged deprivation of liberty interests, Plaintiffs have discussed, and the Court has considered, the liberties afforded by the First and Fourth Amendments.  Because the record reveals no infringement on these constitutionally protected liberties, Plaintiffs' procedural due process claim fails at the first step of the analysis because Plaintiffs have not developed facts to show deprivation of a protected liberty interest.  There can be no deprivation without due process if there was no deprivation at all.  Therefore, the Court finds that summary judgment for Defendants is appropriate as to Plaintiffs' procedural due process claim.

### 3.   *Equal Protection*

Plaintiffs also allege that the application of the Controlled Access Laws to Jehovah's Witnesses infringes on their right of equal protection.  Defendants move for summary judgment on this claim, arguing that the Controlled Access laws are applied consistently to all groups.  The Fourteenth Amendment provides that states shall not "deny to any person . . . the equal protection of the laws."  Equal protection of the laws means that "no person or class of persons shall be denied the same protection of the laws which is enjoyed by

CIVIL NO. 04-1452 (JP)          -39-

other persons or other classes in the same place and under like circumstances." <u>Walsh v. Com. of Mass.</u>, 618 F.2d 156 (1st Cir. 1980) (quoting <u>Missouri v. Lewis</u>, 101 U.S. 22, 31 (1879)).  In order to violate the equal protection clause, the law in question must purposefully discriminate against a person or class of persons. <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976).

     In the present case, Plaintiffs have neither alleged, nor provided evidence of, purposeful discrimination against Jehovah's Witnesses by way of the Controlled Access Laws.  The record demonstrates no genuine question as to the fact that the relevant laws were created in order to promote the interests of privacy and safety from crime.  Although the Controlled Access Laws may have a more significant impact on the Jehovah's Witnesses as a result of their particular approach to seeking new members, there is nothing to indicate that the laws would not be applied in the same way to a member of any other faith, or to an activist representing a particular political cause, who sought to enter a closed urbanization to spread his or her beliefs.  In the absence of evidence of purposeful discrimination against Plaintiffs, the Court will grant summary judgment for Defendants on Plaintiffs' equal protection claim.  <u>Id.</u>

### F.   <u>Plaintiffs' Claims Brought Pursuant to 42 U.S.C. § 1983</u>

     Plaintiffs' amended complaint invokes Section 1983, alleging that Defendants' actions in passing and implementing the Controlled

CIVIL NO. 04-1452 (JP)          -40-

Access Laws have caused infringement on Plaintiffs' constitutional rights.  As discussed in the preceding sections, Defendants' motions for summary judgment argue that Plaintiffs' claims brought pursuant to Section 1983 and various constitutional amendments must fail because the record shows no violation of the substantive constitutional rights.  However, in some instances the Defendants also separately contest the applicability of Section 1983 under the circumstances.

Section 1983 permits a plaintiff to bring a claim against a person who, acting under color of state law, causes the plaintiff to be denied rights secured by the Constitution or by federal law.  Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997).  Section 1983 does not create any independent substantive rights.  Rather, it only permits private enforcement of existing rights unambiguously conferred by the Constitution or federal law.  Gonzaga University v. Doe, 536 U.S. 273, 283 (2002).  Thus, Section 1983 is the procedural tool through which Plaintiffs may include particular Defendants in an action for violations of constitutional rights.

The municipalities and Commonwealth Defendants argue that Plaintiffs have not demonstrated the necessary causal link between said Defendants' actions and the alleged violations of substantive rights provided by federal law.  However, because the record shows no violations of Plaintiffs' Constitutional or other substantive federal law rights, we need not reach the issue of whether such

CIVIL NO. 04-1452 (JP)          -41-

hypothetical violations were caused by particular Defendants. Accordingly, we will make no separate determination regarding the applicability of Section 1983.

### G. **Defendants' Additional Arguments Regarding Standing, Mootness, and Statute of Limitations**

Several Defendant municipalities raise additional arguments in their motions for summary judgment, including: (1) disputing Plaintiffs' standing to sue under the circumstances of the present case; (2) arguing that Plaintiffs' claims have become moot; and (3) arguing that, under the applicable statute of limitations, Plaintiffs' claims are time-barred.  As with the Section 1983 arguments, the Court need not reach these affirmative defenses because the record already reveals, beyond any issue of genuine material fact, that Plaintiffs cannot demonstrate the required elements of their claims alleging violations of constitutional rights.  Therefore, the Court will refrain from addressing Defendants' separate affirmative defenses.

### V. **ATTORNEY'S FEES**

A careful analysis of Plaintiffs' claims in light of the developed factual record reveals that the Controlled Access laws, as applied to Plaintiffs, do not violate any of Plaintiffs' constitutional rights. Furthermore, the Court notes that Plaintiffs have made clear that they will never be satisfied with less than an agreement to enter a judgment that is prepared by them, and that

CIVIL NO. 04-1452 (JP)          -42-

grants complete access to controlled access urbanizations in Puerto Rico.  Plaintiffs have the financial resources to spend on a large team of attorneys and on other costs for services such as transcription of depositions, while Defendants are simple citizens who have built up their savings in order to live better in organized modern communities on the outskirts of towns.  Plaintiffs' interference with the lives of families living in controlled access communities is unreasonable.

Pursuant to 42 U.S.C. § 1988, the Court may award attorney's fees to the prevailing party in a Section 1983 case.  The First Circuit has held that "a district court may in its discretion award attorney's fees to a prevailing defendant . . . upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation . . ." Tang v. State of R.I., Dep't of Elderly Affairs, 163 F.3d 7, 13 (1st Cir. 1998) (internal quotations omitted).  In the instant case, the Court finds that Plaintiffs brought their case on the basis of motives other than reaching a reasonable solution to the present dispute in accordance with the applicable law.  The Court finds that Plaintiffs' attempt to use their financial strength to litigate in the hopes of reaching the U.S. Supreme Court is frivolous and unreasonable, thus violating 42 U.S.C. § 1988.  Accordingly, the Court will award attorney's fees to Defendants.

CIVIL NO. 04-1452 (JP)          -43-

## VI.   <u>CONCLUSION</u>

In conclusion, the Court **DENIES** Plaintiffs' motion for summary judgment, and **GRANTS** Defendants' motions for summary judgment.  The Court will enter a separate Judgment dismissing with prejudice Plaintiffs' as-applied constitutional claims.  The Court will award costs and attorney's fees to Defendants.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 10th day of August, 2009.


                                     s/Jaime Pieras, Jr.
                                   JAIME PIERAS, JR.
                               U.S. SENIOR DISTRICT JUDGE