IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WATCHTOWER BIBLE TRACT
SOCIETY OF NEW YORK, INC., et al.,

    Plaintiffs,

v.

MUNICIPALITY OF SANTA ISABEL, et al.,

    Defendants.

Civil No. 04-1452 (GAG)

**OPINION, ORDER, AND CERTIFICATION TO THE
PUERTO RICO SUPREME COURT**

    Are there private roads in Puerto Rico? Presented with the argument that roads within an unmanned gated urbanization are private, the court must resolve whether local law allows for private roads. The court finds itself in the familiar circumstance of certifying a question to the Puerto Rico Supreme Court because this is an issue of first impression that relies upon interpreting the laws and Constitution of Puerto Rico, and because the state of the law is unclear. The general issues of this complex case likely are known to the Justices of the Puerto Rico Supreme Court due to this court's prior certification order and the attention this case has garnered from the press and general public. The court briefly lays out the state of the law, discusses the importance of the federal and Commonwealth courts working in harmony, and issues temporary relief until the conclusion of the matter by the Puerto Rico Supreme Court. To be clear, the court is not seeking an advisory opinion from the Puerto Rico Supreme Court. The disposition of this issue will resolve all further proceedings in front of this court. Prospectively, final disposition of this matter will have ramifications beyond this case and will clarify the law for future litigants.

**I.**    **Procedural Background**

    This case was originally filed on May 18, 2004, by Watchtower Bible Tract Society of New York and the Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc. ("Plaintiffs") against the Commonwealth, numerous state and municipal officials, municipalities, and

**Civil No. 04-1452 (GAG)**                                             2

urbanizations ("Defendants"), seeking declaratory judgment regarding the constitutionality of the Access Control Law, P.R. LAWS ANN. tit. 23, §§ 64-64h (2008). After the First Circuit remanded the case to the district court, 634 F.3d 3 (1st Cir. 2011), the Municipal Defendants were required to ensure Plaintiffs could access all manned gated urbanizations and were given the opportunity to propose action plans to ensure access to all unmanned gated urbanizations. (See Docket No. 710.)

After resolving the issues involved with manned urbanizations, the court certified to the Puerto Rico Supreme Court the question of whether unmanned gated urbanizations are lawful and constitutional under Puerto Rico law. Watchtower Bible Tract Society of New York, Inc. v. Municipality of Santa Isabel, et al., CT-2012-010; see Docket No. 795. The parties fully briefed this issue before the Commonwealth's highest court. A three-member panel of the Puerto Rico Supreme Court sitting during the Court's summer recess denied certification of this question, leaving it currently unresolved. (See Docket No. 855.) Subsequently, the court made several rulings that ensured Plaintiffs could access unmanned urbanizations. In so doing, the court balanced the principles of the federal Constitution with laws and principles contained in the Puerto Rico Constitution.[1] However, again faced with an issue of first impression, the court seeks assistance from the Puerto Rico Supreme Court to interpret Puerto Rico's laws and Constitution.

The court required all Municipal Defendants to provide Plaintiffs with access to all unmanned urbanizations within their respective bounds. The court relied upon Puerto Rico's Civil Code and Supreme Court precedent to determine which urbanizations fall under the auspices of the Access Control Law. Dorado contends that one urbanization is privately owned and completely

---

[1] Plaintiffs' amended complaint alleges violations of the federal Constitution. (See Docket No. 49 ¶ 5.) In crafting a remedy, the court cannot overlook substantive law from Puerto Rico and must recognize the Puerto Rico Supreme Court as the ultimate authority regarding Puerto Rico's laws and Constitution. The court fashions its declaratory judgment pursuant to the Declaratory Judgment Act. 28 U.S.C. §§ 2201-2202 (2010). It would be senseless to enact a regime that is unlawful or unconstitutional under Puerto Rico law. The Declaratory Judgment Act confers substantial discretion on the federal court to declare the rights of the litigants, see KG Urban Enterprises, LLC v. Patrick, 693 F.3d 1, 27 (1st Cir. 2012) (citing Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)), but implementing an unlawful or unconstitutional regime is beyond the scope of the court's power.

**Civil No. 04-1452 (GAG)**                              3

closed to the public. Upon order from the court, Dorado submitted a brief in support of this contention with the original deed of the property ("Original Deed"), certification of the development from Dorado, the declaration of Orlando Ivan Vargas Lopez, and the segregation deed ("Segregation Deed"). (See Docket Nos. 1087-1087-2, 1169-1.) Plaintiffs responded in a concise brief. (Docket No. 1132.)

## II.     Factual Background of Brighton Country Club

The Brighton Country Club ("BCC") is a collection of residences that operates as an unmanned gated urbanization. Originally private property, BCC was developed and segregated into multiple residences. (See Docket No. 1087-1 at 4; Docket No. 1169-1 at 5 (stating "BCC built the Brighton Country Club development, which . . . has several residential lots . . . .").) BCC created a homeowners' association that intends the property to be used as "a planned community with the highest quality of life." (See Docket No. 1087-1 at 4.) Germane to the court's analysis, the Original Deed states:

> It is hereby established that all roads and streets within the Project shall be deemed Common Properties of the Club; therefore, the Club shall, in the best interest of all its Members, endeavor and assume the obligation to repair, rehabilitate, resurface and otherwise maintain said roadways and streets, to provide for the maintenance and clean up of all right of ways, and to provide drainage along said roadways. The Club shall have the power to place any reasonable restrictions upon the use of the streets and roadways within the Project, including but not limited to types and sizes of vehicles permitted to use such roads and streets, the maximum speed, and even if these are more restrictive than the laws of Puerto Rico, they will not be considered unreasonable.

(See Docket No. 1087-1 at 10.) Dorado approved the project on the condition that the streets remained private and the homeowners' association remained in charge of maintenance. (See Docket No. 1069-1 at 1.)

During construction, BCC sought and received government approval pursuant to the Access Control Law to build a gate across its entrance. (See Docket No. 1087 ¶ 4.) Upon completion, the developers segregated all roadways and common areas, and then transferred title to the homeowners' association, not to Dorado or any other governmental agency. (See Docket No. 1087 ¶ 10; 1069-1 at 5-8.) The Segregation Deed identifies four streets within the urbanization. (See id.) The streets are described as private and constructed pursuant to the permit issued by the Permits and Regulations

**Civil No. 04-1452 (GAG)**                                                 4

Administration ("ARPE" for its Spanish acronym). (See Docket No. 1169-1 at 5.) The segregation of title was performed with authorization from the Permits and Management Office ("OGP" for its Spanish acronym). (See Docket No. 1169-1 at 4.)

Due to these facts, Dorado argues BCC's roads are completely private, closed to the public, and not subject to the orders of this court. The parties do not dispute that BCC is neither a single residence nor a farm. It is also agreed that BCC has not been dedicated under the Condominium Law (formerly known as the Horizontal Property Law). See P.R. LAWS ANN. tit. 31 § 1291. Dorado supports its position by emphasizing that BCC paid for the development of the roads and maintains the roads without Dorado's assistance. (See Docket No. 1087 ¶¶ 6-8.)

### III.    Discussion

The Puerto Rico Supreme Court has not determined whether private roads can lawfully exist in Puerto Rico. However, the Court has indicated on a number of occasions that the Puerto Rico Civil Code mandates that all roads maintain their public nature. Caquías Mendoza v. Asoc. de Residentes de Mansiones de Río Piedres, 134 D.P.R. 181, Offic. Trans. (1993) ("[W]e must point out that under our current body of laws, streets constitute property intended for public use, and that we have considered them public forums for freedom of expression purposes."). The public nature of the roads is not disrupted when access is controlled pursuant to the Access Control Law. See id. "The concept of access control implies that *the public nature of residential streets* must be preserved, while allowing residents to establish the means to control vehicular traffic and public use, thus watching after their own security and promoting a favorable environment for community coexistence." Id. (emphasis in original); see also Asociacion Pro Control de Acceso Calle Maracaibo, Inc. v. Cardona Rodriguez, 144 D.P.R. 1, 28 Offic. Trans. (1997) ("Restrictions of third-party rights must be kept to a minimum, without forgetting that the only thing the law authorizes is to control the traffic of motor vehicles and the public use of certain residential public roads.").

The public nature of Puerto Rico's streets is rooted in the Puerto Rico Civil Code. Section 1024 states, "The following are things of the public domain: Those intended for public use, as roads, canals, rivers, streams, and others of a like nature." See P.R. LAWS ANN. tit. 31, § 1024. Section 1025 states:

> The property of public use in Puerto Rico and the towns thereof comprises the Commonwealth and local roads, the squares, streets, fountains and public waters, walks, and public works for general use, paid for by the said towns or from the Treasury of Puerto Rico. All other property, possessed by either the Commonwealth of Puerto Rico or the municipalities thereof, is common property for the use of the general and municipal governments (bienes matrimoniales), and shall be governed by the provisions of this Code.

See P.R. LAWS ANN. tit 31, § 1025. The Puerto Rico Supreme Court held these provisions require roads to be open for public use. See Maracaibo, 144 D.P.R. at 28. Provisions of the Civil Code recognize that land is susceptible to private ownership, but further state that streets used for public purposes lose their ability to be privately owned. See P.R. LAWS ANN. tit. 31, § 1082.[2] Implementation of the Access Control Law does not change the public nature of the roads contained within the urbanizations. See P.R. LAWS ANN. tit. 23 § 64 ("Municipalities may grant permits to control motor vehicle traffic and the public use of public thoroughfares in . . . streets."); Caquias, 134 D.P.R. 181 ("First, we must point out that, ordinarily, the permit granted by a municipality to a residents' association to control the access to residential streets within the development *must be construed and implemented in accordance with the public nature of said streets*.") (emphasis in original).

Due to the resemblance between unmanned gated urbanizations and private communities located in other parts of the United States, fear of effectively converting these public roads into private roads was a concern prior to passage of the law. See MARGARITA E. GARCÍA CÁRDENAS Derecho de urbanizaciones: servidumbres en equidad, controles de acceso e instalaciones vecinales

---

[2] This section, titled "Things not susceptible of ownership," states:
> Among the things which are not susceptible of ownership are comprised those which cannot become private property by reason of the object for which they are intended, such as things in common, or those the use and enjoyment of which belong to all men.
>
> There are other things, on the contrary, which, although by their nature are susceptible of private ownership, lose this quality as a consequence of their being applied for public purposes inconsistent with private ownership, but which may acquire their former condition so soon as they cease to be applied to that purpose; such are the lands used for highroads, streets and public squares.

**Civil No. 04-1452 (GAG)**                       6

80 (Alberto Medina Carrero ed., 1st ed. 2010) (English translation attached as Appendix 1). Of greatest concern was when a private developer, owning all the land to be developed, was the one who sought and erected the controlled access gate. See id. Professor García Cárdenas states:

> As pointed out previously, this special law has been extremely useful for developers. Its approval by the legislature created a controversy as to whether the provision would have the effect of converting public streets into private access roadways. In particular, in the cases in which the developer is the one who submits the area to the law, the question arose as to whether those streets were public or private. In these cases, when offering the first houses for sale and selling them, the area is already subject to the controlled access law. The impression is that those streets are not public. The impression is completely wrong. It is relevant to remember that the Mortgage Act's requirement for the registration of urban developments is to first segregate and transfer the streets to the Municipality.

See id. The Mortgage Law states:

> No segregation whatsoever may be recorded in the case of any urban development of a property without first presenting the documents in which the lots set aside for common or public use are segregated and in which the dimensions of the rest of the area set aside for these purposes is stated in accordance with the plans and specifications approved and recorded in the Registry of Plats.

P.R. LAWS ANN. tit. 30 § 2314.[3] It seems the streets must be segregated and then transferred to the municipality prior to the sale of the individual lots. See GARCÍA CÁRDENAS, *supra* at 80 (quoting the Mortgage Law).[4] Synthesizing the provisions of the Civil Code, it seems the roads servicing BCC are public by nature. BCC constructed its gate pursuant to the Access Control Law, which recognizes the public nature of the roads within urbanizations. The deed reveals that BCC has not

---

[3] It is common practice for municipalities to ask for the segregation and transfer of title at the end of the development, thereby delaying the municipality's responsibility to maintain and care for the public property. See GARCÍA CÁRDENAS, *supra* n.177 ("In practice, many mayors prefer not to have the streets ceded to them when the development starts; on the contrary, they prefer to get the transfer when the subdivision's construction ends, since they do not want to assume any maintenance obligations until these are no longer used to move construction trucks.")

[4] "The mortgage regulations specify: 'Those parcels that, according to the blueprints approved by the government agencies involved, must be segregated in order to be destined for common or public use shall be segregated prior to any other parcels. The area intended for the same purposes but for which segregation was not required shall be recorded through a note on the margin.'" GARCÍA CÁRDENAS, *supra* at 80 (quoting Mortgage Regulations Article 101.1).

**Civil No. 04-1452 (GAG)**                          7

been dedicated to the Condominium Law; therefore, the roads contained within seem to be public.

However, how the Puerto Rico Supreme Court would apply the law to these facts is unclear. BCC segregated title to the common areas and transferred ownership to the homeowners' association rather than to Dorado.  Dorado was complicit in this transfer and specifically required BCC to keep and maintain the roads as private property. Seemingly, this transfer contradicts the Mortgage Law's requirement of transferring title to the Municipality, provisions of the Puerto Rico Civil Code that require all roads to be maintained for public use, and Puerto Rico Supreme Court precedent.  The ARPE and the OGP both permitted the construction and the segregation.  Because BCC paid to construct and maintain the roads and continues to hold title to the land, a colorable argument can be made that the roads are private.  It is for these reasons the court certifies the following question to the Puerto Rico Supreme Court:

**Do the laws and Constitution of Puerto Rico allow for private residential roads?**

The answer to this question is of crucial importance to the present case.  The Puerto Rico Supreme Court previously denied certification because the petition did not meet the requirements of the Commonwealth of Puerto Rico Judiciary Act of 2007, P.R. LAWS ANN. tit. 4, § 24s(f).  (See Docket No. 855.)  The court believes this question meets the criteria for certification.  The Puerto Rico Supreme Court may answer certified questions from a United States District Court when "matters pertaining to Puerto Rican law are implicated that may determine the outcome thereof, and with regard to which, in the opinion of the petitioning court, there are no clear precedents in the jurisprudence of said court."  P.R. LAWS ANN. tit 4 § 24s (f).  The court has dispensed of all remaining issues in this case.  P.R. LAWS ANN. tit 4A § 25(a).  Resolution of this issue is all that remains before the court, other than enforcing previous orders. This determination relies solely upon Puerto Rico law and there is no equivalent federal statute or constitutional provision upon which the court may base its ruling.  P.R. LAWS ANN. tit 4A § 25(c).  No clear precedent on this matter of law exists.  P.R. LAWS ANN. tit 4A § 25(j).  It is a matter of first impression for both the courts of the Commonwealth and the federal court.  As explained below, the court believes the prudent course of action is to certify the question to the Puerto Rico Supreme Court rather than attempting to predict a future ruling of the Puerto Rico Supreme Court.

### IV.  Principles of Comity and Federalism

The ideal of comity[5] between local and federal courts is not a trifling concept. Comity is "'neither a matter of absolute obligation, on the one hand, nor a mere courtesy and good will, upon the other.'" See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 409 (1964) (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)). The mutual respect between state and federal courts affords the participants a timely resolution of matters and a sense of finality. See Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Federalism simply describes the "legal relationship and distribution of power between" the federal and state governments, but recent jurisprudence seems to expand the working definition of federalism to incorporate "cooperative federalism.[6]" BLACK'S LAW DICTIONARY 687 (9th ed. 2009); see Cullen v. Pinholster, 131 S. Ct. 1388, 1401 (2011) (explaining virtues of "comity, finality, and federalism" in the habeaus corpus context). Together, these principles guide the court when tasked to interpret new areas of local law.

Rather than boldly asserting itself as the ultimate authority of local law, a federal court should afford the local judiciary the opportunity to be the first to rule on the legality or constitutionality of local law. See Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 40 F.3d 18, 24 (1st Cir. 1994). This can be achieved by invoking abstention doctrines or by certification. See Sullivan v. City of Augusta, 511 F.3d 16, 44 (1st Cir. 2007). Certification is appropriate when the determination may moot a federal constitutional question. See City of Houston, Tex. v. Hill, 482 U.S. 451, 471 (1987); Harman v. Forssenius, 380 U.S. 528, 534-35 (1965). The certification mechanism is widely applauded as increasing the likelihood of a federal court answering the substantive question correctly and demonstrating a federal court's respect for the state court. See Rebecca Hollander-Blumoff, *The*

---

[5]  Comity is, a practice among political entities (as nations, states, or courts of different jurisdictions), involving especially mutual recognition of legislative, executive, and judicial acts. BLACK'S LAW DICTIONARY 303-04 (9th ed. 2009).

[6]  Cooperative federalism is the distribution of power between the federal government and the states in which each recognizes the powers of the other while jointly engaging in certain governmental functions. BLACK'S LAW DICTIONARY 687 (9th ed. 2009).

*Psychology of Procedural Justice in the Federal Courts*, 63 HASTINGS L.J. 127, 169 (2011) (stating benefits of certification are "getting the legal question substantively correct[,] . . . not creating contrasting precedent [between the state and federal courts, and] . . . signals respect and deference to the state court system's capabilities to determine its own state law."); *Examining the Power of Federal Courts to Certify Questions of State Law*, 88 CORNELL L. REV. 1672, 1697 (2003) ("[C]ertification offers a federalism benefit to federal courts. Insofar as it allows a state court to determine pertinent issues of state law, certification spares a federal court the difficult chore of determining state law."). It is with the utmost respect for the Puerto Rico Supreme Court that the court submits this question.

The Puerto Rico Supreme Court may find it necessary to determine the constitutionality of unmanned gates when resolving the issue of private roads. BCC is an urbanization operating an unmanned gate and the two issues are so interrelated that a determination of one may determine the other. The question was the subject of the previous certification order by this court on June 18, 2012. (See Docket No. 795.) Because neither the Puerto Rico Supreme Court, nor the federal court determined whether unmanned gates are constitutional under the Puerto Rico Constitution, the court herein incorporates its reasons for certifying that question and appends the certification order to this certification order as Appendix 2.

Both Plaintiffs and Municipal Defendants have appealed the court's rulings regarding unmanned gated urbanizations. (See Docket Nos. 1000, 1130, 1140.) The parties are likely to appeal this order to the First Circuit as well. However, the court retains jurisdiction and has been enforcing its injuction. Any ruling by the Puerto Rico Supreme Court will also benefit the First Circuit, or this court following an appellate ruling.

**V.    Temporary Remedy During Pendency of Certification**

While this certification remains pending before the Puerto Rico Supreme Court, the court must fashion a temporary remedy. When Dorado initially raised its objections to including BCC in the court's orders, BCC nonetheless provided a means of access to Plaintiffs. (See Docket No. 1021.) At the time, it was clear that access was granted on a temporary basis pending the disposition of this issue. (See id.) Until final disposition has been rendered, the court orders BCC to continue

**Civil No. 04-1452 (GAG)**                    10

to provide access to Plaintiffs.  This remedy is temporary and is intended only for the parties.  It should not be interpreted as a harbinger of how the court would ultimately rule.  Final disposition rests with the Puerto Rico Supreme Court.

**VI.** **Conclusion**

The Clerk of Court shall transmit this certification to the Clerk of the Puerto Rico Supreme Court pursuant to P.R. LAWS ANN. tit. 4, app. XXI-A, 25 and shall include all appendices attached.

**SO ORDERED**.

In San Juan, Puerto Rico this 11th day of June, 2013.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge