IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WATCHTOWER BIBLE TRACT SOCIETY OF N.Y., INC., ET AL., | |
| Plaintiff, | |
| v. | CIV. NO.: 04-1452(GAG/SCC) |
| MUNICIPALITY OF DORADO, ET AL., | |
| Defendant. | |

## OPINION AND ORDER

For well over a decade, Jehovah's Witnesses have fought for access to Puerto Rico's urbanizations—neighborhoods on public streets, surrounded by controlled-access gates—so that they might be able to perform one of the central tenets of their religion: the door-to-door preaching of "the contents of the Bible and its importance to people today." AMENDED COMPLAINT, Docket No. 49, ¶ 58. In seeking to exercise their basic First Amendment rights, the Jehovah's Witnesses have met much resistance, especially from some of the urbanizations into

which they seek entry. To alleviate these impositions on the Jehovah's Witnesses' rights, the Court has put into place a remedial structure that charges the covered municipalities with ensuring that the urbanizations within their jurisdiction respect the Jehovah's Witnesses rights to enter and preach door-to-door. Now before me on a referral from the presiding district judge is a motion alleging that the Municipality of Dorado has failed in its obligations and seeking a finding that Dorado is in contempt. Docket No. 1409; *see also* Docket No. 1415. A hearing on this matter was held on January 22, 2015. *See* Docket No. 1417.[1] Based on the evidence adduced at that hearing, it is apparent that Dorado misunderstands its obligations; as a result, it has repeatedly failed to secure the Jehovah's Witnesses' free exercise rights within Dorado's urbanizations.

---

**1.** Originally, Plaintiffs also sought sanctions against Dorado regarding two other urbanizations, Los Prados and Mi Querido Viejo. The parties reached an agreement during the hearing whereby Plaintiffs agreed not to continue to seek sanctions regarding these two urbanizations. As part of this agreement, Dorado admitted to receiving several letters regarding problems at those urbanizations. The parties further agreed to the following, which the Court adopts: The Jehovah's Witnesses do not have access to tele-entry codes for Los Prados or Mi Querido Viejo; Dorado will provide tele-entry codes for both urbanizations once the Jehovah's Witnesses provide Dorado with a telephone number that the codes can be programmed with.

Below, I first explain why Dorado's understanding of its obligations is inconsistent with the repeated statements of this Court and the First Circuit; second, I recount Dorado's repeated incidents of non-compliance; third, I make several remedial orders aimed at ensuring Dorado's future compliance; and last, I recommend that the presiding judge make certain contempt findings against Dorado.

## I.   Dorado's Obligation to Protect the Jehovah's Witnesses Free Exercise Rights

The urbanizations into which the Jehovah's Witnesses seek entry are nominally private entities, but under Puerto Rico law, their streets are public. The urbanizations must be approved by the municipality in which they are located, and as such the municipalities have a direct role in making sure that the urbanizations' policies do not impede public access or citizens' constitutional rights. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardía De Jesus* [hereinafter, *Watchtower I*], 634 F.3d 3, 6–7 (1st Cir. 2011); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Colombani* [hereinafter, *Watchtower II*], 712 F.3d 6, 8–9 (1st Cir. 2013). Moreover, there are hundreds of urbanizations in Puerto Rico, and so while they are each likely state-actors with regards to Plaintiffs' access, administration of an injunction against

each individual urbanization would prove highly burdensome for both the Court and for Plaintiffs. Accordingly, the Court has used its broad discretion to design a remedial scheme that focuses on the municipalities. *See, e.g.*, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Municipality of San Juan* [hereinafter, *Watchtower III*], 773 F.3d 1, 7 (1st Cir. 2014) ("The centerpiece of the district court's remedial scheme with respect to unmanned urbanizations is a mandatory injunction directed at the municipal defendants."). This decision "[r]ecogniz[es] the pivotal role of the municipalities in the permitting process and the idiosyncracies of the urbanizations that dot the landscape." *Watchtower II*, 712 F.3d at 13.

With respect to manned urbanizations, the Court entered an injunction "mandating defendant Municipalities to ensure that all urbanizations within their jurisdiction are in compliance with the pronouncements of the First Circuit." Docket No. 710, at 2; *see also* Docket No. 718 (entering judgment against Dorado on these grounds). To that end, Dorado and other covered municipalities were ordered to "certify an action plan" that would "assure that any Jehovah's Witnesses denied access [to a manned urbanization] be granted entry promptly, within a reasonable time." Docket No. 710, at 3. The action plan that

Dorado submitted, Docket No. 787-1, and which was ulti-
mately approved by the Court with Plaintiffs' consent, Docket
No. 790, is rather vague on the specifics of how Dorado would
meet its obligations. It merely "urge[s]" urbanizations to
comply with the Court's orders (which were, of course,
directed to the municipalities), and, with respect to non-
compliant urbanizations, Dorado washes its hands of the
problem, informing the urbanizations that they may be
"declared in contempt of the Court as well as to claims for
damages and to the imposition of economic sanctions." Docket
No. 787-1, at 2; *see also id.* at 3 ("If the refusal to authorize
access to the urbanization or the community is reiterated, the
incident will be notified to the [Court] for it to take the proper
legal measures."). These matters notwithstanding, the action
plan *does* commit the Dorado municipal police to assisting
Jehovah's Witnesses gain access to intransigent urbanizations;
indeed, a responding officer is required to "remain at the site
until the visitor gains access." *Id.* at 3.

Dorado's action plan evinces a misapprehension of its role
in the remedial scheme. It apparently sees its role as, princi-
pally, an informational one: tell the urbanizations what they
are meant to do, and tell the Court when the urbanizations

don't comply. Statements made by Dorado's counsel at the contempt hearing confirm that the municipality does not believe that it is required to enforce the Court's orders vis-à-vis its urbanizations. For instance, Dorado's counsel asked the Court to cite one of its urbanizations directly for contempt, seeking to shirk its own duty with respect to that urbanization.

Given this misapprehension, it bears restating what the record already makes exceptionally clear: "each municipality has an ongoing duty to ensure that the First Amendment is respected in the urbanizations founded under its auspices." *Watchtower III*, 773. F.3d at 9; *see also* Docket No. 633, at 4–5 ("[A] municipality's delegation of a portion of its authority over public streets to homeowners' associations does not abrogate the municipality's obligation to ensure that public streets remain available for public use."). To this end, Dorado, like other municipalities, may "impose sanctions on a wayward urbanization even after a permit is issued and recorded." *Id.* (citing P.R. Laws Ann. tit. 23, § 64d). Thus, when a Jehovah's Witness is denied access to an urbanization in Dorado, "legal responsibility . . . may be placed on" Dorado itself. *Id.* at 8–9. Given these principles, to the extent that the Dorado Action Plan was ever sufficient, it has plainly been superseded by

subsequent orders of this Court and the First Circuit. Dorado *must* protect the Jehovah's Witnesses' First Amendment rights within its urbanizations.

Dorado's conduct and arguments also make clear that it misunderstands what this Court means when it says that the Jehovah's Witnesses must be given "access" to urbanizations. As I explain in more detail below, on at least one occasion an urbanization in Dorado made the Jehovah's Witnesses' entry into an urbanization contingent on their parking in a specific spot (in a particularly large urbanization) and, more problematically, not knocking on residents' doors. In this case, the Jehovah's Witnesses, with the help of Dorado's Police Commissioner, were able to cross the urbanization's threshold, but they were not allowed to preach. Surprisingly, Dorado argued at the hearing that it had satisfied its obligations pursuant to the Injunction at Docket No. 710, because the congregants had "accessed" the urbanization.[2] Implicit in Dorado's argument is

2.   Similarly, Dorado's counsel asked a number of questions of witnesses during the hearing that stressed that its agents did not themselves prevent the Jehovah's Witnesses from preaching in Sabanera. In fact, there is no evidence that any of Dorado's officers did anything to actively impede the Jehovah's Witnesses rights; indeed, when its police chose to respond, it seems that they did so with a mostly-correct

the belief that "access," as used in Docket No. 710, means nothing more than physically passing the urbanization's gate.

Dorado's position is flatly wrong. Worse, it reveals that after eleven years of litigation, Dorado still does not understand the important First Amendment concerns that have animated this case. The Jehovah's Witnesses' purpose in bringing this suit is not simply to walk silently down the streets of Puerto Rico's controlled-access communities; rather, they brought this suit so as to be free to engage in door-to-door ministry, an important tenet of their faith. For decades, Jehovah's Witnesses have fought to secure that precise right. As the Supreme Court has written:

> For over 50 years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering. It is more than historical accident that most of these cases involved First Amendment challenges brought by Jehovah's Witnesses, because door-to-door canvassing is mandated by their religion. . . . [B]ecause they lack significant financial resources, the ability of the Witnesses to proselytize is seriously diminished by regula-

---

> understanding of the Witnesses' rights of access to Sabanera. These facts neither insulate nor absolve Dorado, however. As I explain, the municipality had to do more than not impede Plaintiffs' access—the municipality had to *ensure* it.

tions that burden their efforts to canvas door-to-door.

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 160–61 (2002). Likewise, the First Circuit wrote in *Watchtower III* that "[t]here can be no doubt that the First Amendment protects access to traditional forums, including public streets, *for the purposes of engaging in door-to-door ministry*." *Watchtower III*, 773 F.3d at 11 (emphasis added); *see also Watchtower I*, 634 F.3d at 10–11 ("Access to public streets and property for purposes of expression, *including door-to-door religious proselytizing*, has long been protected by the First Amendment." (emphasis added)). The point is that the door-to-door ministry is the conduct that the Jehovah's Witnesses are seeking to protect. To a great degree, the controlled-access regimes of Puerto Rico's urbanizations have been found to be unconstitutional as applied to Plaintiffs precisely *because* they impeded Plaintiffs' right to engage in that ministry. Thus, it beggars belief when Dorado argues that it has complied with its obligations by giving the Jehovah's Witnesses physical access to an urbanization when that access is predicated on giving up the right that the Witnesses have all along sought to protect.

Dorado's position is all the more unreasonable given that the presiding judge specifically rejected it almost two years ago in a published opinion that explicitly applied to all covered municipalities. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Rodríguez*, 920 F. Supp. 2d 241 (D.P.R. 2013).[3] In that matter, an urbanization in San Juan, Puerto Rico, allowed Plaintiffs to physically enter, but it prohibited them from engaging in door-to-door ministry. *See id.* at 241. There, the urbanization argued—as Dorado does here—that the Court's orders only required entry, but were "silent as to whether Jehovah's Witnesses have the right to ring doorbells, knock on doors, or otherwise enter private property in order to complete their door-to-door ministry." *Id.* at 242. The presiding judge rejected the urbanization's arguments out of hand: "The case law governing this issue is clear. Not only do Jehovah's Witnesses have the right to enter urbanizations, but they also have the right [to] ring doorbells and knock on household doors, even if they must enter private property to do so." *Id.* Writing in bold and with caps-lock on, the presiding judge went on to "explicitly endorse[] the right of the Jehovah's Witnesses" to

---

**3.**   This Opinion is also available at Docket No. 904.

engage in such conduct. *Id.* (emphasis omitted). Furthermore, the municipalities were "warn[ed]" that the Court "w[ould] not tolerate *any* restrictions placed on such activities by a Municipality or an urbanization." *Id.* (emphasis added).[4]

It has thus been clear for at least two years that Plaintiffs' right of "access" to urbanizations includes the right to engage in protected religious activity within those urbanizations, including door-to-door ministry. Further, Dorado—like all other covered municipalities—must not allow urbanizations to place conditions on Plaintiffs' exercise of their First Amendment rights; indeed, where urbanizations in Dorado attempt to do so, it is Dorado's responsibility, pursuant to this Court's judgment, to see that the practice is ended.

---

**4.** In the Supreme Court's words, the right of a person to approach a home's door generally "depend[s] upon the will of the individual master of each household, and not upon the determination of the community." *Martin v. City of Struthers*, 319 U.S. 141, 141 (1943). Thus, while neither Sabanera nor any other urbanization can wholesale prohibit Plaintiffs from accessing their public streets for the purposes of engaging in protected First Amendment activity, individual homeowners may express their own personal unwillingness to be solicited. *See id.* To this end, the presiding judge has previously ordered Plaintiffs to respect individual homeowners' wishes to be left alone, such as when that wish is expressed through a sign. *See Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 920 F. Supp. 2d 241, 242–43 (D.P.R. 2013).

## II. Dorado's Failures to Ensure Plaintiffs' Access to Urbanization Sabanera de Dorado

Plaintiffs attempted and failed to enter Urbanization Sabanera de Dorado several times since August 2014. Below, I recount each of those instances along with Dorado's failure to remedy the situation.

On August 30, 2014, Carlos Ramos-Maldonado, along with his wife and another member of the congregation, went to Sabanera to preach at around 10:30 in the morning. After stating their names and purpose, the guard denied them access to the urbanization. Ramos called the municipal police, but the officer who answered said that they were too busy to send anyone to help. As such, Ramos and his companions left, unable to perform their ministry. As they were leaving, an employee leaving the urbanization told them, "the administration is willing to pay the fines, so please don't come back." This incident was reported to Bernardo Rivera, the elder in charge of coordinating preaching, who reported it to the Jehovah's Witnesses' New York legal department.

On October 17, 2014, at around 11:00 a.m., Tomás Pérez, along with his wife and daughter, attempted to enter Sabanera to preach door-to-door. After identifying themselves and

stating their purpose, the guard on duty denied them access, stating that the area was private. Pérez then called the municipal police. The officer to whom Pérez spoke confirmed that the guard had to grant Pérez entry; he then asked Pérez for his name and cell phone number and said he would come to Sabanera. Pérez waited for 45 minutes at a friend's house inside of Sabanera, but he never received a phone call from the officer. As such, he was unable to preach door-to-door that day.

On November 22, 2014, Ramos returned to Sabanera along with Rivera and another congregant. They identified themselves and stated their purpose but were denied entry by the guard. Ramos called the municipal police and was told to call a Lt. Ortíz, whose cell phone number Ramos was given. Ramos and his companions waited thirty minutes to see if any police assistance arrived, and when it did not, Ramos called Lt. Ortíz, who said he was too busy to help and that Ramos should call the Police of Puerto Rico ("POPR"). Ramos then called the municipal police again, and the desk sergeant said that he called POPR but they were busy and there would be a wait. Ramos and his companions waited another thirty minutes, to no avail. They left, unable to perform their ministry. The

incident was reported by Rivera to Plaintiffs' legal department.

On January 1, 2015, Bernardo Rivera went to preach, along with his wife and sons, at around 11:00 a.m. After identifying themselves and their purpose, they were refused entry by the guard. Rivera called the police and spoke with an officer whose name he believes to have been Torres. Agent Torres told Rivera that he was not allowed to intervene and that Rivera should go to Commonwealth court in Bayamón, file a motion, and return with an order from that court saying that he was permitted to enter Sabanera. Rivera hung up and waited thirty minutes for police assistance to arrive; none did, and so he left, unable to perform his ministry. Rivera reported the incident to Plaintiffs' legal department.

After the failed entry on January 1, 2015, where Rivera was given the oddly specific—and confusing—instruction to seek a writ from a Commonwealth-court judge, Plaintiffs filed a motion seeking that Dorado be held in contempt. Docket No. 1411. Pursuant to a referral order from the presiding judge, I scheduled a contempt hearing for January 15, 2015. *See* Docket No. 1414. That hearing was not held. Plaintiffs made it clear that they were seeking compliance more than they were seeking sanctions. As such, I gave Dorado twenty-four hours

to solve the problems that had given rise to the contempt motion, in the hopes that doing so might obviate the need for contempt proceedings. *See* Docket No. 1417 (giving the parties 24 hours to "file a joint motion informing of compliance in providing access").

But even after that Order—and with the threat of contempt proceedings looming—Dorado failed to make good on its obligations. On January 16, 2015, at around 1:00 p.m., Pérez arrived again at Sabanera along with two other congregants. They identified themselves and stated their purpose, and this time the guard told them that they could enter the urbanization, but only on the condition that they park in a specific spot near the gate and refrain from knocking on doors within the community.[5] Pérez then called Rivera to tell him what had happened. Pérez waited for some time, and eventually Rivera called him back and told him to call the municipal police. Pérez did so, and eventually the Commissioner of the Dorado police,

---

**5.** With regard to the matter of parking, counsel for Dorado asserted without evidence that Sabanera does not permit street parking. The evidence adduced at the hearing shows, to the contrary, that guests and residents routinely park on Sabanera's streets.

Guadalberto Matos-Burgos, arrived on the scene.[6] Together, Pérez and Commissioner Matos went to speak with Sabanera's administrator. Commissioner Matos told the administrator that Pérez had a right to preach door-to-door, but the administrator said that she had been told to only allow Jehovah's Witnesses physical entry into the urbanization. Eventually, however, the administrator relented and said that Pérez could do his ministry. Commissioner Matos and Pérez left, but the administrator soon changed her mind—apparently after a phone call with Sabanera's counsel—and told Pérez that he couldn't knock on doors after all. Commissioner Matos heard the

---

**6.**   How, precisely, Commissioner Matos arrived on the scene is the only point of real factual contention to arise from the hearing. According to Pérez, he called the municipal police and spoke to an agent named Pagan, who in turn called Commissioner Matos. Commissioner Matos testified, however, that he received a call from Dorado's municipal administrator, Orlando Vargas-López, who told him to go to Sabanera; Commissioner Matos further testified that Pagan told Matos that there had been no previous call to the station regarding Sabanera. No evidence was introduce as to why Vargas called Commissioner Matos. To the extent that there is even a conflict between Pérez's and Commissioner Matos's testimony, it is likely the result of each witness having incomplete information regarding what was happening that day. In any case, I find that Pérez did call the municipal police, as he testified, but that Commissioner Matos was called by Vargas. Ultimately, it matters very little, as Pérez and Commissioner Matos agree on the substance of what happened at Sabanera that day.

administrator say this, but he did nothing to reverse or supersede her decision. As such, Pérez left, unable to perform his ministry. Pérez reported these events to Rivera, who reported them to the Jehovah's Witnesses' legal department.

Altogether, the evidence at the hearing shows that on at least four occasions, Jehovah's Witnesses were refused entry by Sabanera, and, despite contacting the municipal police, were given no assistance whatsoever. This violates the Court's clear mandates as well as Dorado's action plan. On a fifth occasion, the police arrived but failed to ensure that the Jehovah's Witnesses were able to engage in door-to-door ministry, despite the Court's explicit command that Plaintiffs' rights of entry could not be conditioned on their agreeing to give up their right to proselytize. This constitutes a meaningful pattern of non-compliance on Dorado's part.

Dorado argues that there is no such pattern because, according to its municipal administrator, Orlando Vargas-López, it only learned of the problems with Sabanera last week. To similar effect, Dorado's counsel repeatedly asked the testifying Jehovah's Witnesses whether they had notified anyone in the municipality other than the police. Apparently, these questions were meant to suggest that Dorado could not

have been expected to solve the problems with Sabanera
because it was unaware of them. But the Witnesses' testimony
that they were repeatedly denied access to Sabanera, and that
they reported these problems to the municipal police, was
utterly credible.[7] And once they called the police, they had no
obligation to do anything further; at that point, Dorado was
constructively aware of the problems and obligated to fix
them.[8] Of course, if Dorado's police are not taking these calls

---

**7.** Beyond the minor discrepancies regarding who told Commissioner
Matos to come to the scene on January 16, 2015, Dorado presented no
evidence whatsoever that would have called Plaintiffs' witnesses'
testimony into question. Dorado did attempt to introduce evidence that
seemingly would have suggested that the names of police officers that
the witnesses remember speaking to were incorrect, but that evidence
was not admitted. Even if it had been, however, mis-remembered
names from short conversations months in the past would not convince
me that Plaintiffs weren't being truthful. Based on the witnesses'
demeanor and the consistency of their testimonies (not to mention their
consistency with the testimony of Commissioner Matos), I harbor no
doubts that the incidents occurred as recounted above.

**8.** The action plan on which Dorado so heavily relied during the hearing
instructs Jehovah's Witnesses denied access to an urbanization to call
the municipal police, who are obligated to "promptly attend the
complaint presented, in order to guarantee compliance with the court
order." Docket No. 787-1, at 3. This is consistent with the operative
judgment, which requires municipal action plans to provide a method
by which Jehovah's Witnesses turned away at manned urbanizations
may vindicate their rights, such as by "a municipal police hotline."

seriously, or are not appropriately reporting them up the chain of command, that is not a problem for Plaintiffs or this Court. It is a problem for Dorado, and one it should consider resolving.

## III.    Remedial Orders

Given Dorado's repeated non-compliance, its failure to come to terms with the breadth of this Court's judgments, and the weak compliance mechanisms in its action plan, I believe that various remedial orders are necessary to ensure Dorado's future compliance with the Court's mandates. Chief among these is a requirement that Dorado's action plan be updated so as to explicitly comply with the Court's orders. At a minimum, the amended action plan must do the following:

1. *Require*—not urge—manned urbanizations within the municipality to grant Jehovah's Witnesses access to the urbanizations. It must make explicit the fact that "access" means more than physical entry; it means the right to engage in door-to-door ministry. It must also make clear urbanizations may not impose conditions on the Jehovah's Witnesses outside of those found in

---

Docket No. 710, at 3; *see also* Docket No. 718.  At no point does the plan suggest that any other municipal officer need be contacted.

orders from this Court or the First Circuit.

2. Implement a sanctions regime under this auspices of the municipal administrator, by which the municipality will punish urbanizations that fail to provide Plaintiffs with full access. The sanctions regime *may* include monetary sanctions, but it *must* include the revocation of controlled access permits for urbanizations that repeatedly deny Plaintiffs access.

3. Provide a contact number by which Jehovah's Witnesses can notify the municipal police that they have been denied access to an urbanization, and obligate the municipal police to promptly respond. Further, responding municipal police officers must *actually ensure* that the Jehovah's Witnesses are granted full access, including, if necessary, by locking gates in an open position.

4. Require the police to make reports of all such calls by Jehovah's Witnesses, and to forward such reports to a designated official within the municipal government.

The theme running through these requirements is that the Court should not need to be involved in the routine disciplining of intransigent urbanizations. Under the Court's judgments

and orders, that job is Dorado's, and it should be performed without this Court's intervention. The Court does not intend to cite individual urbanizations (which are not parties to this lawsuit) for contempt; it will, however, hold municipalities in contempt for failing to "ensure that the First Amendment is respected in the urbanizations founded under [their] auspices." *Watchtower III*, 773 F.3d at 9. To that end, Dorado must develop a mechanism by which *it* will protect Plaintiffs' rights. A draft updated action plan, consistent with the above, must be filed with the Court by Friday, February 13, 2015.[9] Dorado is reminded, however, that the above discussion is merely a restatement of the orders and mandates already in the record and operative upon it; as such, the Court expects Dorado to act in accordance with those principles *immediately*.

As for the specific matter of Sabanera, by 5:00 p.m. on January 27, 2015, a municipal officer must speak with the urbanization's administrator and inform her of the urbanization's responsibility to respect Plaintiffs' First Amendment rights, as well as Dorado's responsibility to use its authority to see that those rights are respected. The Court expects that

---

**9.** Dorado is forewarned that the Court will extend neither this nor the other deadlines imposed by this Order.

Plaintiffs will have no further issues entering Sabanera, but Dorado shall inform Sabanera's admnistrator that if another instance of non-compliance is brought to this Court's attention, the result will be an immediate and forcible opening of Sabanera's gates, which will remain open until such time that the Court can be convinced that Sabanera will respect the public's rights of access.[10] Dorado shall file a motion in compliance with this Order by 7:00 p.m. on January 27, 2015.

## IV.    Contempt

The evidence adduced at the hearing shows that on five different occasions, Dorado failed to ensure that Jehovah's Witnesses attempting to preach door-to-door in Sabanera were able to do so. In each case, Dorado was in contempt of this

---

**10.**  Without evidence, Dorado suggested that Sabanera believes itself to be a wholly private subdivision, and thus not covered by the Court's judgments. The question of whether private roads even exist under Puerto Rico law is currently before the Supreme Court of Puerto Rico, and as such this Court would be in no place to rule on the question even if Dorado or Sabanera did prevent evidence. Further, the presiding judge has suggested that even subdivisions claiming to be private shall be subject to this Court's judgments pending a ruling in their favor from the Supreme Court of Puerto Rico. *Cf.* Docket No. 1173, at 9–10 (ordering Brighton Country Club to "continue providing access to Plaintiffs" pending the Supreme Court's resolution of the certified question).

Court's previous orders. Moreover, in the most recent instance, Dorado failed to comply despite an additional order from the undersigned, as well as a pending contempt proceeding. Pursuant to 28 U.S.C. § 636(e)(6), I certify the above facts to the presiding district judge and recommend that Dorado be held in contempt and fined $1,000 for each instance of non-compliance, for a total of $5,000. I further recommend that Dorado reimburse Plaintiffs for their attorneys' fees in the amount of $3,000.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 26th day of January, 2015.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE