# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**WATCHTOWER BIBLE TRACT SOCIETY OF NEW YORK, INC., et al.,**

    **Plaintiffs,**

    **v.**

**MUNICIPALITY OF PONCE, RESIDENTS ASSOCIATION OF ESTANCIAS DEL GOLF CLUB,  et al.,**

    **Defendants.**

**CASE NO. 04-1452 (GAG)**

## OPINION AND ORDER

After twelve years of litigation in this First Amendment case involving the rights of Jehovah's Witnesses, the Court is at a crossroad regarding a widely-debated question of Puerto Rico real property law.  Are roads in gated urbanizations of private or public nature?  Specifically in this case the issue pertains to streets within Estancias del Golf Club in the Municipality of Ponce.  However, the much broader legal issue pertains to many other such communities within the island's municipalities.

Pending before the Court are Plaintiffs' and Defendant Municipality of Ponce's ("Ponce") Cross-Motions for Summary Judgment. (Docket Nos. 1630; 1635.)  Both parties submitted substantial oppositions and replies to the respective memoranda of law and statements of fact. (Docket Nos. 1655; 1682; 1698.)  Shortly after Plaintiffs and Ponce moved for cross-summary judgment, upon order of the Court, Plaintiffs joined the Residents' Association of Estancias Del Golf Club ("Estancias del Golf Club" or "EGC") as a party to this litigation.  (See Docket Nos. 1662; 1664; 1686.)  The Court heard oral arguments on February 17, 2016 at the Luis A. Ferré Courthouse in Ponce, Puerto Rico.  (See Docket No. 1701.)

Civil No. 04-1452 (GAG)

Plaintiffs posit that Estancias del Golf Club's streets are public, therefore said gated community is subject to this Court's orders and permanent injunction, hence, Jehovah's Witnesses must be granted access. (Docket No. 1630.) Ponce stands on the opposite side of the spectrum, contending that because the streets at Estancias del Golf Club were never conveyed to the municipality, they are private and therefore not subject to the injunction. (Docket No. 1635.) Both the First Circuit and this Court in this litigation have held that streets in Puerto Rico are public in nature. After protracted litigation, and various appeals, the Municipality of Ponce raised the argument  —for the first time in April, 2015— that Estancias del Golf Club, a manned gated community, has private streets, therefore, said urbanization is exempt from this Court's injunction granting Jehovah's Witnesses access to gated communities to engage in religious activity protected by the First Amendment. (Docket No. 1635.)

After reviewing the parties' submissions and pertinent law, the Court **GRANTS** Plaintiffs' motion for summary judgment at Docket No. 1630, and **DENIES** Ponce's motion for summary judgment at Docket No. 1635.

## I.   <u>Overview of the Case</u>

Before delving into the required legal analysis, the Court shall summarize the background and procedural history of this action for the benefit and understanding of the parties and the public.

Plaintiffs Watchtower Bible Tract Society of New York and the Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc., initiated this action in 2004, seeking declaratory and injunctive relief under 42 U.S.C. § 1983, for violations of their right to free speech and free exercise of religion, under the First and Fourteenth Amendments of the Constitution of the United States.  (<u>See</u> Docket No. 49 ¶¶ 10-12, 62.)   The Municipality of Ponce is one of eleven named municipalities and several gated community defendants.   Plaintiffs filed suit on behalf of

2

Jehovah's Witnesses who practice their faith and are, or have been, affected in the free exercise of their religion, as a result of the Puerto Rico's Controlled Access Law, Law No. 21 of May 20, 1987, P.R. LAWS ANN. tit. 23, §§ 64-64h.[1]   Jehovah's Witnesses profess the Bible's message publicly by proselytizing from house to house.   This activity falls within the protected speech of the First Amendment of the Constitution of the United States.   See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 160-61 (2002).

In February, 2011, the United States Court of Appeals for the First Circuit remanded this case to this Court to assure that defendant municipalities and urbanizations comply with the law, and that Jehovah's Witnesses are allowed to enter urbanizations to engage in constitutionally protected activity.[2]   Watchtower Bible and Tract Soc'y of New York v. Sagardía de Jesús, et al., 634 F.3d 3 (1st Cir. 2011), *rehearing denied*, 638 F.3d 81 (1st Cir. 2011), *cert. denied* 132 S.Ct. 549 (2011).

The First Circuit found the Commonwealth's Controlled Access Law to be constitutional on its face. It nonetheless found that both manned and unmanned gates, as operated, violated Jehovah's Witnesses' First Amendment right to access public streets within controlled access urbanizations.   Id. at 634 F.3d at 10 (citing Vill. of Stratton, 536 U.S. at 160-62) ("[a]ccess to public streets and property for purposes of expression, including door-to-door religious proselytizing, has long been protected by the First Amendment.").   "Public streets and sidewalks

---

[1] Earlier in 2016, Plaintiffs filed suit against forty other defendant municipalities, claiming identical causes of action to the relief sought here, requesting the District Court implement the remedial scheme fashioned in the above-captioned case.  The undersigned also presides over that case that is currently in early stages of litigation. See Case No. 16-1207(GAG).

[2] The case was initially assigned to my esteemed colleague, the late District Court Judge Jaime Pieras, Jr., who ruled the Controlled Access Law was completely constitutional and did not violate the Jehovah's Witnesses' First Amendment rights to freely exercise and express their religious beliefs. See Watchtower Bible Tract Society of New York, Inc. v. Sánchez-Ramos, 647 F. Supp. 2d 103, 118-19 (D.P.R. 2009).  Plaintiffs appealed the decision to Court of Appeals for the First Circuit.  While partly agreeing with Judge Pieras, the First Circuit held that manned and unmanned urbanization gates violated Jehovah's Witnesses' First Amendment rights.  See Watchtower v. Sagardía de Jesús, 634 F.3d 3, 17 (1st Cir. 2011).

are presumptively traditional public forums, and the Supreme Court has repeatedly reaffirmed their status as places for expressive activity." Watchtower v. Sagardía de Jesús, 634 F.3d at 11 (internal citations omitted).

### a.  Remand and District Court's remedial scheme

After the First Circuit remanded the case to the district court, the municipal defendants were required to ensure Plaintiffs could access all manned and unmanned gated urbanizations. They were given the opportunity to propose action plans to ensure access to all such urbanizations. The Court fashioned its declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2010).    (See Docket No. 710.)    The Declaratory Judgment Act confers substantial discretion on the federal court to declare the rights of litigants. See KG Urban Enterprises, LLC v. Patrick, 693 F.3d 1, 27 (1st Cir. 2012) (citing Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)).   The Court relied upon Puerto Rico's Civil Code and Supreme Court precedent to determine which urbanizations fall under the auspices of the Controlled Access Law.[3]

Subsequently, the Court made several rulings that ensured Plaintiffs could access both manned and unmanned urbanizations around the clock.  In doing so, the Court balanced federal constitution and principles with those contained in the Puerto Rico's Constitution and laws.  As to unmanned urbanizations, municipal defendants were ordered to collect and deliver to Plaintiffs a means of access to all unmanned urbanizations located within their municipality.  Depending on the means of access, each urbanization was ordered to deliver to Plaintiffs a physical key, an access code, a beeper, or any other device necessary to permit entry to the urbanization.  The

---

[3] After resolving the issues involved with manned urbanizations, the Court certified to the Puerto Rico Supreme Court the question of whether unmanned gated urbanizations are lawful and constitutional under Puerto Rico law.  (See Docket No. 795.)  The parties fully briefed this issue before the Commonwealth's highest court.  A three-member panel of the Puerto Rico Supreme Court sitting during the Court's summer recess denied certification of this question, leaving it unresolved.  (See Docket No. 855.)

**Civil No. 04-1452 (GAG)**

means of access provided had to be *equal* to that of the residents of those urbanizations and had to grant Plaintiffs unfettered access to the urbanizations.   (See Docket No. 978.)   The remedy provided by the Court was confirmed on appeal, except for some minor modifications.   See Watchtower Bible and Tract Soc'y of New York v. Mun. of San Juan, et al., 773 F.3d 1 (1st Cir. 2014).

### b.  Defendant Municipality of Dorado and Brighton Country Club

On remand, during the implementation of the First Circuit's mandate, Dorado was the first defendant municipality to argue that an urbanization within its bounds was privately owned and completely closed to the public.  Said urbanization, Brighton Country Club ("BCC") operated under an unmanned controlled access regime. [4]  Upon order from the Court, Dorado submitted a

---

[4] The Brighton Country Club ("BCC") is a collection of residences that operates as an unmanned gated urbanization.  Originally private property, BCC was developed and segregated into multiple residences.  (See Docket Nos. 1087-1 at 4; 1169-1 at 5 (stating "BCC built the Brighton Country Club development, which . . . has several residential lots . . . .").  BCC created a homeowners' association that intends the property to be used as "a planned community with the highest quality of life."  (See Docket No. 1087-1 at 4.)  Germane to the Court's analysis, the Original Deed states:

It is hereby established *that all roads and streets within the Project shall be deemed Common Properties of the Club;* therefore, the Club shall, in the best interest of all its Members, endeavor and assume the obligation to repair, rehabilitate, resurface and otherwise maintain said roadways and streets, to provide for the maintenance and clean up of all right of ways, and to provide drainage along said roadways. The Club shall have the power to place any reasonable restrictions upon the use of the streets and roadways within the Project, including but not limited to types and sizes of vehicles permitted to use such roads and streets, the maximum speed, and even if these are more restrictive than the laws of Puerto Rico, they will not be considered unreasonable.

(See Docket No. 1087-1 at 10) (emphasis added).

"Common Properties" shall mean and refer to real and/or personal property which is actually transferred to, enjoyed by, deeded to or leased and/or owned by the Club for the benefit of the Owners. Such Common Property is for the use and enjoyment by the Owners, their respective families, guests, persons occupying accommodations of Owners on a tenant basis, and subject to the fee schedules and operation rules adopted by the Club, to the extent permitted by law, provided, however, that any lands, buildings or facilities which are leased by the Club for use as Common Properties, shall lose their character as such upon expiration of any lease.

Id. at 6.  Dorado approved the project on the condition that the streets remained private and the homeowners' association remained in charge of maintenance.  (See Docket No. 1069-1 at 1.)

Civil No. 04-1452 (GAG)

brief in support of this contention with the original deed of the property ("Original Deed"), certification of the development from Dorado, the declaration of the Municipal Administrator, Orlando Iván Vargas López, and the segregation deed ("Segregation Deed").  (See Docket Nos. 1087-1087-2, 1169-1.)  Plaintiffs opposed.  (Docket No. 1132.)

Based on these facts, Dorado argued that BCC's roads were completely private, closed to the public, and not subject to the orders of this Court.  Dorado supported its position by emphasizing that BCC paid for the development of the roads and maintained the roads without Dorado's assistance.  (See Docket No. 1087 ¶¶ 6-8.)

### c.  Inter Jurisdictional Certification to the Puerto Rico Supreme Court

The District Court again turned to Puerto Rico's highest court in its search for an answer to the question of Puerto Rico law that arose in this case.  "[C]ertification offers a federalism benefit to federal courts.  Insofar as it allows a state court to determine pertinent issues of state law, certification spares a federal court the difficult chore of determining state law."  EXAMINING THE POWER OF FEDERAL COURTS TO CERTIFY QUESTIONS OF STATE LAW, 88 Cornell L. Rev. 1672, 1697 (2003).[5]

---

During construction, BCC sought and received government approval pursuant to the Access Control Law to build a gate across its entrance.  (See Docket No. 1087 ¶ 4.)  Upon completion, the developers segregated all roadways and common areas, and then transferred title to the homeowners' association, not to Dorado or any other governmental agency.  (See Docket No. 1087 ¶ 10; 1069-1 at 5-8.)  The Segregation Deed identifies four streets within the urbanization.  (See id.)  The streets are described as private and constructed pursuant to the permit issued by the Permits and Regulations Administration ("ARPE" for its Spanish acronym).  (See Docket No. 1169-1 at 5.)  The segregation of title was performed with authorization from the Permits and Management Office ("OGP" for its Spanish acronym).  (See Docket No. 1169-1 at 4.)

[5]  The certification mechanism is widely applauded as increasing the likelihood of a federal court answering the substantive question correctly and demonstrating a federal court's respect for the state court.  See Rebecca Hollander-Blumoff, THE PSYCHOLOGY OF PROCEDURAL JUSTICE IN THE FEDERAL COURTS, 63 Hastings L.J. 127, 169 (2011) (noting that the benefits of certification are "getting the legal question substantively correct[,] . . . not creating contrasting precedent [between the state and federal courts, and] . . . signal[ing] respect and deference to the state court system's capabilities to determine its own state law").

1    On June 11, 2013, the District Court asked the Puerto Rico Supreme Court: "Do the laws

2   and Constitution of Puerto Rico allow for private residential roads?"  (Docket No. 1173.)   The

3   District Court reasoned that the question certified was an issue of first impression that relies upon

4   interpreting the laws and Constitution of Puerto Rico. (Docket No. 1173.)   The Puerto Rico

5   Supreme Court accepted this Court's second request of certification.[6]  (Docket No. 1217.)

6                    **d.   Defendant Municipality of Ponce**

7    Ponce had a history of non-compliance throughout the course of this litigation.  Inasmuch,

8   Ponce Municipal Police was ordered in the past to forcibly open gates as a result of its non-

9   compliance.  (See Docket Nos. 959; 1042; 1046; 1117; 1118; 1180; 1199; 1211; 1213; 1219.)

10  Eventually, sanctions and attorneys' fees were imposed against the Municipality of Ponce for its

11  non-compliance.[7]  (See Docket Nos. 1263; 1264.)

12   Ponce eventually filed its action plan with the Court providing a list of gated urbanizations

13  within its bounds.  (Docket Nos. 821; 1193.)  Ponce's action plan listed Estancias del Golf Club

14  among the manned gated urbanizations that agreed to comply with court orders "duly notified by

15  Municipal Police Officers of their obligation to grant plaintiffs access in order to effectuate their

16  Constitutional rights."  (Docket No. 1193.)

17   In earlier representations to the Court, Ponce argued that, three other urbanizations within

18  its bounds had private roads that were not municipal property, therefore these should be excluded

19  _____

20   [6] The Supreme Court heard oral arguments on February 11, 2014.

21   [7] At one point, the undersigned ordered the Municipality of Ponce to show cause as to why contempt
    shouldn't be entered against it, stating: "Ponce has demonstrated complete disregard for the court's deadlines.
    Time and time again Ponce has failed to comply with court orders in a timely fashion. Missing a deadline once,
22  perhaps even twice, can be forgiven. However, repeated non-compliance cannot. Neither the Municipality, nor
    the citizens of Puerto Rico, benefit from the same. This is not the first time Ponce has been found disregarding
23  orders of this court." (Docket No. 1180.)   Ponce's show cause hearing was held on July 9, 2013.  (See Docket
    No. 1199.)  In due fairness to Ponce's Mayor, the Court ultimately disqualified counsel on September 9, 2015.
    (See Docket No. 1616.)  In its ruling the Court shouldered the blame on him for failing to respond to the Court's
24  directives and appraise the mayor of her obligations in this case.

Civil No. 04-1452 (GAG)

from the Court's injunction.  These urbanizations were: Alhambra Court Garden (unmanned), Estancias del Real (manned), and, Brisas del Laurel (unmanned). (<u>See</u> Docket No. 1110.)  It is important to note that, EGC was never mentioned among those urbanizations with purported private roads.  At that moment, Dorado was raising the similar argument regarding the existence of private roads at Brighton Country Club.  Considering that the matter was still under the Court's consideration, Ponce was given multiple opportunities to brief the private roads issue with supporting legal authority and evidentiary documentation. (Docket 1117.)  It failed to do so.[8]

On April 2, 2015, Plaintiffs requested a Temporary Restraining Order ("TRO") and/or Preliminary Injunction against Ponce and EGC, seeking enforcement of the Court's injunction. (Docket No. 1516.)  In support of their request, Plaintiffs provided a declaration under penalty of perjury of a member of Jehovah's Witnesses that serves the congregation's matters in the Municipality of Ponce.  (<u>See</u> Docket No. 1516-8.)  According to Plaintiffs, Jehovah's Witnesses were denied access to EGC on five (5) occasions that year.  (Docket No. 1516.)  Moreover, Plaintiffs asserted that their efforts to communicate with Ponce to solve these issues had been futile.  A majority of Plaintiffs' letters to Ponce notifying the denial of access were never answered by the Municipality.  The only response received on behalf of Ponce's counsel indicated that the Municipality had no obligation to provide access to EGC because said urbanization had private roads and was not a named defendant in the above-captioned case.  <u>Id.</u>

On April 6, 2015, the Court issued a TRO directed against Ponce and EGC, ordering them to provide Jehovah's Witnesses immediate and unfettered access to EGC.  Said order contemplated, if necessary, "forcibly removing the gates and/or putting chains on the same to

---

[8] Ponce was ordered to file a complete list of urbanizations and a brief on private roads issue by May 23, 2013. (Docket No. 1117.)  Later on, the Court gave Ponce a second chance, awarding a *sua sponte* extension to file list of urbanizations and private roads brief by June 1, 2013. (Docket No. 1153.)  The Court even suggested that Ponce appear in the certification proceeding before the Commonwealth Supreme Court.

guarantee Jehovah's Witnesses access."  (Docket No. 1521.) A hearing was held on April 28, 2015, where Estancias del Golf Club appeared represented, by counsel. There, for the first time, it argued that its streets are private in nature, and thus, should be exempt from this Court's injunction.  (Docket No. 1552.)  In view of the issue raised, the Court extended the TRO, ordered discovery and briefing as to the issue of the nature of EGC's streets. Id.  This TRO was extended on multiple occasions and ultimately extended *sine die*, as long as the private roads issue remained *sub judice*.[9]  (Docket Nos. 1554; 1578; 1615; 1659.)

        Plaintiffs and Ponce briefed the issue.  On September 29, 2015, Plaintiffs filed a Motion for Summary Judgment against the Municipality of Ponce and urbanization EGC arguing the urbanization's streets are public.  (Docket No. 1630.)  In turn, the Municipality of Ponce opposed arguing that Plaintiffs' motion at Docket No. 1630 should be held in abeyance until the residents' association of EGC and its developer, Ven Lour, were joined as parties.  (Docket No. 1635.) Ponce, further, cross-moved for summary judgment seeking that judgment as a matter of law be entered in its favor, arguing that EGC has private streets, and therefore, said urbanization must be deemed exempt from this Court's injunction.  (Docket No. 1635).

        Plaintiffs filed a Reply and Response in Opposition to Ponce's Cross-Motion for Summary Judgment. (Docket No. 1655.)  Per leave of Court, Ponce filed its Reply to Plaintiffs'

---

        [9] The parallel and similar issue regarding the nature of roads in Brighton Country Club raised by the Municipality of Dorado, following the Commonwealth Supreme Court's ruling has never been adjudicated by this Court.  The concerned parties have not moved for any relief.  Thus, as of today, the roads at BCC are deemed public streets for purposes of this Court's mandatory injunction.

        Besides Ponce and Dorado, there are other municipalities claiming that urbanizations within their bounds contain private roads.  In this same case, the Municipality of Gurabo also raised the private roads argument as to Ciudad Jardín I.  See Docket No. 1575.  The parties provided their arguments and supporting legal briefs but have not moved the Court to dispose of the controversy.

        Likewise, in Watchtower Phase II (Case No. 16-1207 (GAG)), the defendant municipalities of Cidra and Fajardo have raised similar arguments.  In light of today's ruling, the undersigned encourages all of the parties mentioned above to re-evaluate their claims.

Civil No. 04-1452 (GAG)

response in Opposition to Ponce's Cross-Motion for Summary Judgment. (Docket No. 1682.)

Thereafter, Plaintiffs filed a Reply to Ponce's Opposition and sur-reply to Ponce's Reply.

(Docket No. 1698.)   On December 3, 2015, the Court ordered Plaintiffs to formally join the

Residents' Association of EGC as party to this litigation.  (See Docket Nos. 1662; 1664; 1686.)

Oral arguments were heard on February 17, 2016 at the Luis A, Ferré Federal Courthouse in

Ponce.  EGC complied and formally appeared in this litigation.  (Docket Nos. 1682; 1708.)

## II.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a).  "An issue is

genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it

'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson

v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-

moving party's case.  Celotex, 477 U.S. at 325.  "The movant must aver an absence of evidence to

support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the

existence of at least one fact issue which is both genuine and material."  Maldonado-Denis v.

Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is

genuinely in dispute by citing particular evidence in the record or showing that either the materials

cited by the movant "do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(B).

If the Court finds that some genuine factual issue remains, the resolution of which could affect the

outcome of the case, then the Court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences.  Id. at 255.  Moreover, at the summary judgment stage, the Court may not make credibility determinations or weigh the evidence.  Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation."  Forestier Fradera v. Mun. of Mayagüez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (citing Adria Int'l Group, Inc. v. Ferré Dev. Inc., 241 F.3d 103, 107 (1st Cir. 2001)) (internal quotation marks omitted).  Although each motion for summary judgment must be decided on its own merits, each motion need not be considered in a vacuum.  Wells Real Estate, 615 F.3d at 51 (quoting P.R. American Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 133 (1st Cir. 2010)) (internal quotation marks omitted); Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 852 F. Supp. 2d 208, 213 (D.P.R. 2012) on reconsideration in part, 889 F. Supp. 2d 265 (D.P.R. 2012).  "Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time, applying the same standards to each motion."  Wells Real Estate, 615 F.3d at 51 (quoting P.R. American Ins., 603 F.3d at 133) (internal quotation marks omitted).

### III.   The Arguments

The Court shall proceed to summarize seriatim the arguments presented in each motion.

### a.   Plaintiffs' Motion for Summary Judgment and arguments in support (Docket No. 1630.)

Plaintiffs request that judgment as a matter of law be entered in their favor for the following reasons.  First, that Estancias del Golf Club's streets are public.   Plaintiffs carve their arguments in support of this assertion as follows:  (1) EGC's streets were transferred to the Municipality on October 2002 by virtue of the Ponce Municipal Legislature's Resolution No. 73; (2) EGC operates a Controlled Access Law system authorized by the Municipality of Ponce in June 2006, Ordinance No. 81; (3) Permits and Regulations Administration permits were sought to build EGC; (4) municipal funds were sought to build EGC's infrastructure; (5) the resident's association does not own the streets;  and last; (6) the resident's association held a "special assembly" on May 30, 2015 to discuss transferring the streets.  (Docket No. 1630.)

Second, Plaintiffs argue that Ponce and EGC are subject to this Court's order and mandatory injunction. In support of their second assertion, they argue that Ponce's action plan represented that Estancias del Golf Club was included in the action plan.  Id.

### b.   Ponce's Response to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment (Docket No. 1635.)

Ponce initially contends that Plaintiffs' summary judgment motion should be held in abeyance pending the joinder and appearance of Ven Lour and Estancias del Golf Club, as necessary parties, pursuant to FED. R. CIV. P. 19, for adjudication of the issue of private roads and those at EGC.[10]  Id.

---

[10] Ponce's necessary party argument becomes moot given that EGC was formally joined as a party and given an opportunity to brief the issue.  (See Docket Nos. 1662; 1664; 1686.)

Civil No. 04-1452 (GAG)

Ponce also moved the Court to enter judgment as a matter of law in its favor based on the following arguments: First, the Constitution and laws of Puerto Rico permit the existence of private roads and those of EGC are indeed of such nature.  The Puerto Rico Supreme Court, in fact, recognized this state of the law in <u>Watchtower v. Municipality of Dorado</u>, 192 P.R. Dec. 73 (P.R. 2014) (Slip Certified Translation at Docket No. 1559), when answering this Court's certified question.  Moreover, Ponce posits the Supreme Court's ruling established a difference between roads that are funded with municipal or public funds, and are dedicated to public use *vis a vis* roads that are paid for with private funds.

Second, Ponce contends that the transfer of streets to Municipality never took place. (Docket No. 1635 at 9.)  It posits that the maintenance and repairs of the streets are funded privately by EGC's residents association and not by the municipality.  The residents association funds the maintenance of the streets, but the title of the streets belong the developer, Ven Lour. <u>Id.</u>

Ponce further argues that, under Puerto Rico real property law, ownership of streets of residential developments is not transferred by the legislative intent of the Municipality. (Docket No. 1635 at 9.)  Accordingly, the decisive question before the Court is whether under Puerto Rico law the intention of the Ponce municipal legislature to accept the conveyance of the streets, without the actual deed of transfer and affirmative act of possession, is sufficient to create municipal ownership, therefore bestowing public character to the streets.

Ponce posits that EGC had the intention of transferring streets to the Municipality; however these were never accepted due to inadequate conditions.  Thus, the conveyance of the streets has not taken place and as such these are not property of the Municipality.  (Docket No. 1635 at 9.)  As such, they continue to be private property.  <u>Id.</u>  More so, Resolution No. 73 conditioned the acquisition of the streets on the Mayor and representatives "to perform the

**Civil No. 04-1452 (GAG)**

necessary legal acts in the form of a public deed or other public document to actually execute the transfer."   Id. at 11.

> **c.  Plaintiffs Reply to Ponce's response in Opposition and Plaintiffs Response in Opposition to Ponce's Motion for Summary Judgment** (Docket No. 1655.)

Plaintiffs argue that since EGC failed to oppose Plaintiffs' Motion for Summary Judgment, Plaintiffs' materials facts are deemed admitted.  (Docket No. 1655 at 6.)   Further, Ponce has failed to provide conclusive evidence that EGC's streets have not been conveyed to the municipality.

> **d.  Ponce's reply to Plaintiffs' response in Opposition to Ponce's MSJ** (Docket No. 1682.)

Ponce contends that, in light of the Commonwealth's Watchtower v. Dorado, public streets "are those that are funded and maintained by the towns themselves and that are dedicated to public use."  (Docket No. 1682.)  In response to the argument that EGC's streets are public regardless of whether the actual transfer took place, Ponce contends that "the imposition of conditions by the Municipality for the approval of the Estancias residential development did not, by itself, convey a public nature to the streets of Estancias." (Docket No. 1682 at 5.)

> **e.  Plaintiffs' reply to Ponce's Opposition and sur-reply to Ponce's Reply** (Docket No. 1698.)

Plaintiffs argue that EGC offers no factual or documentary support of its claim that its streets are 'private.'  "With the exception of a block quote from an appellate decision regarding the doctrine of laches, the urbanization's [o]pposition cites no legal authority." (Docket No. 1698.)   Further, Plaintiffs contend that the 'private streets' defense is barred by the doctrine of laches.  Id. at 3.  Plaintiffs reiterate their argument that the Puerto Rico Supreme Court's ruling did not invalidate statutes, case law and legal presumptions regarding streets and urban developments in Puerto Rico.  In addition, Plaintiffs reject Ponce's argument at Docket No. 1682,

14

**Civil No. 04-1452 (GAG)**

to the effect that imposition of conditions by the Municipality barred the conveyance of the streets for public use.  (Docket No. 1698.)   Plaintiffs contend that Ponce fails to offer legal authority in support of said argument, and that it is inconsistent with the legal framework regarding urban development.  Id.  "As highlighted in the high court's decision, it is the prerogative of the State— not of a developer, homeowner, or municipal employee—to determine what constitutes a 'public purpose' and what conditions must be fulfilled to engage in urban development."  (Docket No. 1698 at 9 (citing Watchtower, 192 P.R. Dec. at 96)).   Further, Plaintiffs argue that "[t]o hold otherwise, would foment noncompliance with urban planning requirements as it would, in effect, suggest that the conditions imposed by the government are not legally binding and that developers may feel free to disregard these conditions if they so desire."  Id. at 9.   Finally, Plaintiffs posit that the Court should rule that EGC has *constructive public streets* for First Amendment purposes.  (Docket No. 1698 at 9) (Emphasis in original).

### f.  **Estancias del Golf Club's briefs** (Docket Nos. 1688; 1712)

EGC joined both Ponce's motion for summary judgment at Docket No. 1635 and its reply to Plaintiffs' opposition at Docket No. 1698, arguing that the streets within its bounds have not been transferred to the municipality and, thus, are private property.  It also argued against the application of the doctrine of laches. (See Docket Nos. 1688; 1712.)

## IV.   **Relevant Factual Background**

### a.  **Plaintiffs' Statement of Uncontested Facts** (Docket No. 1630-1)

Estancias del Golf Club is an urbanization in Ponce, Puerto Rico. (Docket Nos. 1630-1 ¶ 11; 1635-1 ¶ 11).  It currently has a controlled access regime operated by a manned gate.  Id. EGC was developed by Ven Lour Enterprises Inc. ("Ven Lour").  (See Resolution No. 73) (Docket Nos. 1630-1 ¶ 12; 1635-1 ¶ 12.)   A summarized account of the permits issued by the

Ponce Municipal Legislature and requested by Estancias del Golf Club or by Ven Lour during the development stages of the urbanization follows.

In April 1992, the Ponce Municipal Legislature passed Resolution No. 47, endorsing the name "Estancias del Golf Club" for the project upon request by Mr. Lombardo Perez, engineer for the project "as part of APRE requirements to issue the construction permit." (Docket Nos.  1630-1 ¶ 13; 1630-6.)  In addition, the Municipal Legislature ordered that a copy of Resolution No. 47 be sent to the "Naming Commission of Structures and Public Roads of the Commonwealth of Puerto and to the Permits and Regulations Administration ("ARPE" for its Spanish acronym) to take appropriate action."  (Docket No. 1630-1 ¶ 13.)[11]

In April 1997, the Municipal Legislature passed Resolution No. 214, authorizing Ponce to enter into a contract with Ven Lour, for the construction of a storm drainage system for Estancias del Golf Club and its surrounding areas.  (Docket No. 1630-1 ¶ 14.)  The Municipal Legislature waived the bidding requirements and gave Ven Lour "a credit to be applied to the construction taxes obligations owned by Ven Lour to the Municipality, up to the sum of $100,000.00" as "[i]t is in the best interest of the municipality and the public . . . [that] the Municipality be authorized

---

[11] Ponce objects to Plaintiffs' statement at paragraph thirteen.  Ponce claims said statement is not relevant and is therefore inadmissible evidence pursuant to Rule 402 of the Federal Rules of Evidence. (Docket No. 1635-1 ¶ 13.)  .  Ponce's contention is premised on its legal arguments is support of its motion for summary judgment and its interpretation of the Puerto Rico Supreme Court Opinion in this case:

> The issue before the Court is whether the streets of Estancias del Golf are private or public. Pursuant to the Puerto Rico Supreme Court opinion . . . the nature of the streets depends on whether they are maintained with public or private funds or whether they have been transferred to the governmental entity. The statement proposed by plaintiffs does not make this fact more or less probable. As a matter of Puerto Rico law, the Property Registry conveys a presumption of correction regarding the ownership of real property. [P.R. LAWS ANN. TIT. 30 § 2354.]  As per evidenced in Docket No. 1617-3, . . . ownership of the streets of Estancias del Golf is still bestowed upon Ven Lour[sic]. Additionally, transfer of the streets of Estancias del Golf to the Municipality of Ponce has not been materialized and the maintenance of those streets is funded by the Resident Association of Estancias del Golf.

Docket No. 1635-1 at 9.  The Court notes Ponce's objection. However, the discussion that follows will address the matter.

16

to, while exempt from bidding procedures, directly contract with Ven Lour for construction."
(Docket No. 1630-8.)

On October 14, 2002, the Ponce Municipal Legislature passed Resolution No. 73, authorizing the mayor to accept the transfer of streets in Estancias del Golf Club from Ven Lour. (Docket Nos. 1630-1 ¶ 15; 1635-1 ¶ 15.)  The resolution was signed by Mayor Rafael Cordero Santiago the following day.  Resolution No. 73 reads as follows:

**ADMINISTRATIVE BILL:**

**TO AUTHORIZE THE HONORABLE MAYOR OF PONCE, IN REPRESENTATION OF THE AUTONOMOUS MUNICIPALITY OF PONCE, TO ACCEPT VEN-LOUR ENTERPRISES, INC.'S CONVEYANCE OF STREETS IN THE ESTANCIAS DEL G[O]LF CLUB URBANIZATION OF PONCE, PR; AND FOR OTHER PURPOSES**

**WHEREAS: VEN LOUR** . . . developed a housing project known as Urbanization Estancias del G[o]lf Club in Ponce, Puerto Rico;

**WHEREAS: VEN LOUR** . . . has allotted areas in the development project to be designated as streets and has given notice of its intent to transfer the aforementioned to the Autonomous Municipality of Ponce;

(Docket No. 1630-2.)  Moreover, it recognized that the municipalities' permit office  "authorized the subdivision of plots to be set aside for streets, by means of Case Number PLG-2001- 0035 (97-0000925)" and outlined the names of the streets and plots that were segregated. (Docket Nos. 1630-1 ¶ 16; 1635-1 ¶ 16; 1630-2.)  It also certified that the corresponding municipal agency had inspected and endorsed the acceptance of the streets, *"determining that said acceptance of these streets is useful and convenient for public use."*  (Docket No. 1630-2 at 2) (emphasis added).

**THEREFORE: BE IT RESOLVED BY THIS HONORABLE MUNICIPAL LEGISLATURE OF PONCE, PUERTO RICO:**

**SECTION ONE:**   That the Hon. Rafael Cordero Santiago be authorized, on behalf of the Autonomous Municipality of Ponce, to accept from VEN-LOUR ENTERPRISES, INC. the conveyance of the Streets mentioned in the THIRD WHEREAS of this Resolution.

Civil No. 04-1452 (GAG)

**SECTION TWO:** The Hon. Rafael Cordero Santiago is authorized as Mayor of Ponce or a designated representative to, in the name of and in representation of the Autonomous Municipality of Ponce, appear in all corresponding deeds and in each and every public document necessary to execute the transfer of streets, as authorized by this Resolution.

Id. at 3. On April 6, 2006, the Ponce Municipal Legislature approved and issued a "Building Permit" to the residents association of EGC for the construction of a controlled access system. (Docket Nos. 1630-1 ¶ 17; 1635-1 ¶ 17; 1630-3.)   The same date, the Municipal Legislature also approved and issued a "Use Permit" to the residents' association of EGC for the controlled access system. (Docket Nos. 1630-1 ¶ 19; 1635-1 ¶ 19; 1630-4.)

On June 13, 2006, the Ponce Municipal Legislature passed Ordinance No. 81, (Docket No. 1516-2) granting a petition by a group of residents of EGC to implement a controlled access regime. (Docket Nos. 1630-1 ¶ 18; 1635-1 ¶ 18) (see also Ordinance No. 81, Docket No. 1516-2.) Ordinance No. 81 provides that the Municipality of Ponce issues the controlled access permit for EGC, as per Law No. 81 of August 30, 1991, P.R. LAWS ANN. tit. 21, § 4054(p), as amended, also known as the Autonomous Municipalities Act of the Commonwealth of Puerto Rico. Pursuant to said authority delegated by the Commonwealth legislature, Ponce enacted Ordinance Number 45, Series 2002-2003, which adopted the new "[r]egulation authorizing the closure of streets, roads, pathways and walkways; authorizing the sale thereof and granting of permits for the control of vehicular traffic and public use of municipal streets." (Docket No. 1516-2 at 1.) It further provides that after reviewing the residents' petition and the report rendered by the corresponding committee, "this legislature, pursuant to Ordinance No. 45, Series 2002-2003, accepts the recommendation made by the Commission on Closures of Streets, Pathways and Roadways regarding the underlying petition to this Ordinance, and authorizes the access control requested by the Estancias del Golf Club Development of Ponce." (Docket No. 1516-2 at 2.)

**IT IS HEREBY ORDERED BY THIS MUNICIPAL LEGISLATURE OF PONCE, PUERTO RICO:**

**SECTION ONE:** Accept and adopt the favorable recommendation made by the Commission on Closures of Streets, Pathways and Roadways of the Autonomous Municipality of Ponce with respect to the petition for access control submitted by the Estancias del Golf Club Development, Barrio Magüeyes of Ponce.

**SECTION TWO:** The Board of Directors of the Estancias del Golf Club Development shall guarantee equal access at all times to all residents of the community, including those opposing access control.

**SECTION THREE:** The Board of Directors of the Estancias del Golf Club Development shall initiate proceedings before the Permit Office for the Autonomous Municipality of Ponce to request the closure and facilities for access control thereof.

**SECTION FOUR:** The Board of Directors of the Estancias del Golf Club Development shall coordinate access to the development with the various state, federal and/or local government agencies so that they can provide the appropriate services.

**SECTION FIVE:** The Commission on Closures of Streets, Pathways and Roadways of the Autonomous Municipality of Ponce is hereby ordered to give written notification of the Municipal Legislature's decision and send a copy of said Ordinance to the Department of Infrastructure, Environment and Transportation of the Autonomous Municipality of Ponce.

(Docket No. 1516-2 at 2.)

On May 30, 2015, the residents' association of EGC convened in a Special Session to discuss the acquisition or transfer of its streets and sidewalks. (Docket Nos. 1630-1 ¶ 22; 1635-1 ¶ 22.) EGC's August 2015 News Bulletin number two stated the following:

A special session took place last May 30th, 2015 to determine the future of our streets and sidewalks. It was attended by 53 members and was led by Attorney Anselmo Irizarry, who serves as our Association's legal representative before federal forum. At this meeting, current documents were submitted and discussed regarding our situation. The advantages and disadvantages of the transfer process to the municipality were also discussed. The following motions were adopted by a majority vote at the meeting:

1) Authority given to the current board to proceed with the transfer process from Ven Lour to the [Residents'] Association;

2) The streets and sidewalks are not to be transferred to the Autonomous Municipality of Ponce. The aforementioned should belong to the [residents' a]ssociation.

(Docket Nos. 1630-1 ¶ 23; 1635-1 ¶ 23.)  On September 9, 2015, Ponce filed with the Court a copy of Resolution No. 73—the resolution approved by the Municipal Legislature in October 2002 authorizing the Mayor to accept transfer of the streets in EGC from Ven Lour to the Municipality.  (Docket Nos. 1630-1 ¶¶ 23-24; 1635-1 ¶¶ 23-24.)

Ponce responded to Plaintiffs' statement of facts, admitting most of Plaintiffs' proposed facts and raising several objections under FED. R. EVID. Rule 402.  (Docket No. 1635-1 part A.) Ponce objected to several of Plaintiffs' proposed statements, arguing "[a]ny representation made to this Honorable Court before the opinion of the Puerto Rico Supreme Court regarding the nature of streets in Puerto Rico was made with the understanding of the law at that specific moment in time."  (Docket No. 1635-1 ¶¶ 7-10.)

**b.  <u>Ponce's Statement of uncontested facts in support of summary judgment</u>** ("Ponce's SUF") (Docket No. 1635-1 Part B).

EGC is inscribed in the Property Registry as *Parcel No. 6050, folio 81, volume 905* from Section II of the Municipality of Ponce.  (Ponce's SUF, Docket Nos. 1635-1 at 14 ¶ 1; 1655-1 at 2 ¶ 1.)  The inscription lists Ven Lour as title holder of the property.  <u>Id.</u>  In support, Ponce offers a certification of the Property Registry (Docket No. 1654-1) for a parcel of land identified as *Parcel No. 6050, folio 81, volume 905* from the Municipality of Ponce which includes restrictive covenants imposed by Ven Lour.[12]  (Docket No. 1635-1 ¶ 2.)

---

[12] Plaintiffs admit and qualify the above statement, arguing it is supported by an incomplete record of the Property Registry.  (See Plaintiffs' opposition to Ponce's SUF, Docket No. 1655-1 ¶ 1.)  Plaintiffs qualify the above statement, arguing that according to the Resolutions approved by the Municipality of Ponce Permit Office, EGC is recorded in the Property Registry as *Parcel No. 6050, folio 11, volume 709* of Ponce, Section II. (See Docket Nos. 1655-1 ¶ 1; Resolution January 8, 2002 (Docket No. 1655-5) ("Resolution January 2002"); Resolution February 26, 2008 (Docket No. 1655-7) ("Resolution February 2008")).  Consequently, Plaintiffs argue the record evidence is incomplete considering that Ponce submitted as an exhibit a Registry Certification

Said restrictive covenants are intended for, but not limited to, the residents' association of EGC. (Ponce's SUF, Docket No. 1635-1 ¶ 3.)[13]   Amendment six of the restrictive covenant provides that:

> AMENDMENT SIX: That in the thirteenth (13) paragraph FIRST (A) of page eleven pertaining to Easement in equity and/or restrictive conditions, First (A) reads: "All of the streets, roads and accesses to be built on the principal shall be for the use and benefit of all of the residents and may not be used for the particular benefit of any of these.  However VEN LOUR . . . or any other natural person or legal entity designated by them, shall have the right to use these streets within the scope of the entrepreneurial purposes and interests of VEN LOUR . . . to use the streets to gain access for future developments in the remainders of the principal properties and/or for the real estate properties which border with the Project object of these restrictive conditions.  VEN LOUR . . . . Shall retain the right to grant the right in turn to third natural parties or legal entities to gain access to the bordering plots of land through the streets of the Estancias del Golf Club project.  None of the rights which VEN LOUR . . . . Reserves for itself may be varied by the [residents' association] nor by any other entity formed by the title holders or homeowners referenced herein, nor by any other person. Eliminate the underlined text.

(Ponce's SUF, Docket Nos. 1635-1 ¶ 4; 1654-1 at 10-11) (emphasis in original).[14]

On September 25, 2012, Engineer John Garnsey García wrote a letter to Mrs. Maria Torres, Administrator of the Municipal Public Works Department regarding the conditions of the streets in ECG. (Docket Nos. 1635-1 ¶ 6; 1655-1 ¶ 6; 1654-3.)  In his letter, Mr. Garnsey García concludes that the "actual condition that prevails after the partial reparation of the streets impedes

---

of *Parcel No. 6050, folio 6, volume 709* and *folio 81, volume 905.*  Plaintiffs argue that because Ponce did not produce the Property Registry certifications for the volume and folio referenced in Ponce's resolutions regarding EGC, it relies on an incomplete record of the property registry.  (Plaintiffs' opposition to Ponce's SUF ¶ 2.)

[13] Plaintiffs admit and qualify this statement for the same reasons they posit to qualify the preceding statement.  (Plaintiffs' opposition to Ponce's SUF, Docket No. 1655-1 ¶ 3.)

[14] Plaintiffs also admit and qualify this statement for the same reasons as the preceding statement, and further note that the Registry Certification submitted by Ponce states that the underlined fragment of the registry inscription was stricken.  (Plaintiffs' opposition to Ponce's SUF Docket No. 1655-1 ¶ 4.)

21

that the Autonomous Municipality accept them for conservation and maintenance."[15] (Docket Nos. 1635-1 ¶ 7; 1655-1 ¶ 7; 1654-3.)   In July 2012, the residents of EGC sent a letter to Honorable María Meléndez Altieri, Mayor of Ponce, requesting the transfer of the streets and sidewalks of ECG to the Municipality of Ponce.  (Docket Nos. 1635-1 ¶ 8; 1655-1 ¶ 8.)  The same stated that their petition had been denied by Engineer Garnsey García on multiple occasions.  (Docket Nos. 1635-1 ¶ 9; 1655-1 ¶ 9.)  The letter further stated that the Residents Association of ECG has been maintaining the streets in the best condition using the monies from its maintenance fee.[16]    (Ponce's SUF, Docket No. 1635-1 ¶ 10.)  Finally, Ponce posits that the residents' association of EGC is responsible for the repairs of its streets and sidewalks and pays for such maintenance with its private funds.  (Ponce's SUF, Docket No. 1635-1 ¶ 11.)  In support of this contention, Ponce provides a statement under penalty of perjury by Mr. Emilio A. Ruiz De Jesús, President of the residents' association of EGC since March 2, 2015.[17]  (See Docket No.  1635-5.)

---

[15] Plaintiffs admit and qualify Ponce's assertion at paragraph six, arguing that the record evidence demonstrates that according to Resolution No. 73 and the resolution of February 2008, as of the date of the later administrative resolution, "the municipality had inspected and approved the acceptance of all of the streets at Estancias del Golf Club, except one exterior street."  (Docket No. 1655-1 ¶ 7.)

[16] Plaintiffs qualify Ponce's proposed statement, arguing that, according to a resolution by the Ponce Municipal Assembly, public funds were used to build part of the original infrastructure for Estancias del Golf Club."  In support of this averment, Plaintiffs' point to Resolution No. 214.  (Docket Nos. 1630-7 at 1-2; 1630-8 at 1-2.)  They further argue that there is no evidence that this urbanization or its residents' association have a legal obligation or responsibility to maintain the streets. EGC, and its residents' association, were not originally involved in the maintenance and repair of the streets and sidewalks as the same letter, relied on by Ponce in their statement at paragraph 10, which states that: "The streets and sidewalks were, originally, repaired by the Developer, to perform the process of the transfer of streets and sidewalks to the Municipality of Ponce." (Docket Nos. 1655-1 at ¶ 10; 1654-4 at 1; 1635-4 at 1.)

[17] Plaintiffs deny the above statement, arguing that "the mere fact that the urbanization and or its residents' association . . .  paid [maintenance of the streets] for the past eight months is not evidence that [they have] a legal obligation or responsibility to maintain the streets or sidewalks."  (Docket No. 1655-1 ¶ 11.) Moreover, Plaintiffs posit that neither the urbanization, nor the residents' association, were involved in the maintenance of the streets and sidewalks as "[t]he streets and sidewalks were, originally, repaired by the developer, to perform the process of transfer of the streets and sidewalks to the municipality." Id. (quoting July 2012 letter to the Mayor of Ponce, Docket No. 1654-4.)  Lastly, Plaintiffs argue that, because Mr. Ruiz De Jesus has served as President of the residents' association from March 2012, his statements should be limited from said date to the present. (Docket No. 1655 ¶ 11.)

       c.  **Plaintiffs' Opposing Statement of Material Facts in Opposition to Ponce's Motion for Summary Judgment** ("Plaintiffs' Opposing SUF") (Docket No. 1655-1 Part II.)

On June 29, 1999, the Permit Office of the Municipality of Ponce approved a Resolution titled 'Approval of Partial Parceling of Lots for Estancias de Golf Club for Case Number PLG 990035 (97-0000925)' (hereinafter "Resolution June 1999"). (Plaintiffs' Opposing SUF ¶ 1; Docket Nos. 1655-3 at 2-4). According to the text of the Resolution, the Department of Public Works and Environmental Conservation of Ponce inspected Streets C-3, C-7, and C-8 and deemed these streets acceptable. (Plaintiffs' Opposing SUF ¶ 2.) The resolution reads as follows:

> By resolution of April 1, 1997, the Director of the Permit Office for the Municipality of Ponce has approved [. . .] the registration plan for the Urbanization Estancias del Golf Club.
>
> <u>The owners are hereby advised to comply with the conditions below prior to the Permit Office's evaluation of the remaining 25 % of the residential units in this project: 1) Submit a certified copy of the deeds of transfer of the streets pertaining to the project in behalf of the Municipality of Ponce.</u>
>
> Streets with signs indicating C-3, C-7, C-8, Avenida Principal, Exterior and Interior that provide access to the proposed plots shall be public in nature once the transfer to the Municipality of Ponce takes effect by the corresponding public deed.
>
> "The interested parties shall file a certified copy of this resolution, the registration plan approved on April 1, 1997, and any other necessary documentation, with the corresponding Property Registry Office in order that said official may proceed in registering the authorized parceling of lots in this case.

(Docket Nos. 1655-1, Plaintiffs' Opposing SUF ¶ 3; 1655-3.)

On January 8, 2002, the Permit Office of the Municipality of Ponce approved another Resolution entitled 'Resolution Authorizing the Partial Parceling of Lots for the Streets of the Estancias del Golf Club.' It provides the following (Docket No. 1655-1, Plaintiffs' Opposing SUF ¶ 4):

Civil No. 04-1452 (GAG)

> a) The land parcel for Estancias del Golf Club "is entered in the [Property] Registry of Ponce, Section II, Folio 11 of Volume 709 as Farm Number 6050.
>
> b) Ven-Lour through Isidro Barros Botello, an engineer, under case number PLG-2001-0035 (97-0000925), has submitted to the Permit Office of the Autonomous Municipality of Ponce for its consideration of an application for the parceling of streets of the Estancias del Golf Club Development.
>
> c) …the Director of the Permit Office for the Autonomous Municipality of Ponce, AUTHORIZES the partial parceling of streets of the Estancias del Golf Club Development[.]
>
> It is hereby stated that the owners shall comply with the conditions below prior to the awarding of any future permit: [. . .]
>
>> c) Submit a certified copy of the deeds of transfer of the streets pertaining to the project in behalf of the Municipality of Ponce[;]
>>
>> d) Submit documents to come up with a mechanism for access control of motor vehicles and public use of the project[;] [. . .]
>>
>> g) The remaining streets of the project shall be parceled and a certified copy of the deeds of transfer of the aforementioned should be submitted in behalf of the Municipality of Ponce.
>
> d) Those requirements and/or conditions set forth in unaltered, previous resolutions in this report will be kept in full force and effect. The interested parties shall file a certified copy of this resolution, approved registration plan, and any other necessary documentation, with the Property Regis[try] Office.

(Docket Nos. 1655-1, Plaintiffs' Opposing SUF ¶ 5; 1655-5.)

On February 29, 2008, the Permit Office of the Municipality of Ponce approved yet another Resolution entitled 'Resolution Authorizing the Partial Parceling of Lots for the Streets of Estancias del Golf Club (Docket No. 1655-1, Plaintiffs' Opposing SUF ¶ 6) which provided the following:

> Partial parceling of most of the Estancias de Golf Club Residential Development's streets was approved under case number PLG-2001-0035 (97-0000925). At this time, some of the streets were not included due to the fact that they were not yet built or were just partially built.

Civil No. 04-1452 (GAG)

Now, [Ven-Lour] through Engineer Isidro Barros Botello, under case PPI 2007-0035 (97-0000024), has submitted to the Permit Office of the Autonomous Municipality of Ponce for its consideration, an application for the parceling of the remainder of the streets in the Estancias del Golf Club Development, and a remnant set aside as Green Area Number 1, in accordance with the submitted plan."

"The Ministry of Infrastructure, Environment, and Transportation, through its engineering division, examined the documents and plans submitted for the project under this caption and after inspecting the repair work performed on the streets, sidewalks and curbs, decided to give its final approval as it relates exclusively to the streets located within the residential development."

"Repairs to Paseo Ruth Fernandez, where work relating to the replacement of the main raw water pipe is being performed as required by the Aqueduct and Sewer Authority, and as a condition set by this agency for this project, are still pending."

We would like to emphasize that final approval of the streets and storm water shall be achieved after the deed for public use is brought forth, which is subject to completing the previously mentioned work.

"[T]he Deputy Director of the Permit Office of the Autonomous Municipality of Ponce, **AUTHORIZES the partial parceling of D-2, D-3, D-4, D-5 and D-7 streets, located in the Urbanization Estancias del Golf Club**[.]"

(Docket Nos. 1655-1, Plaintiffs' Opposing SUF ¶ 7; 1655-7) (Emphasis in original).

## V.   Applicable Law

### a.   The Commonwealth's Controlled Access Law

The Controlled Access Law, Puerto Rico Law 21 of May 20, 1987, ("Controlled Access Law") P.R. LAWS ANN. tit. 23, § 64 *et seq*., enacted in 1987, created a regime to allow a residents association to control the access and vehicular traffic in public residential streets.  The purpose of this legislation was "to authorize housing developments and communities to control vehicular access to, and the public use of their residential streets.  The main purpose of this act is to provide our citizens with an additional mechanism to fight crime, thus encouraging their active participation in said fight."  Caquías v. Asoc. Res. Mansiones Río Piedras, 134 P.R. Dec. 181, 186, Offic. Trans. (P.R. 1993).  "The statute also [sought] to improve the security and peace of

Civil No. 04-1452 (GAG)

our communities so that the neighbors may engage in healthy community coexistence and interaction." Id.  Since its enactment, the Controlled Access Law has sparked much debate.

> The public and private housing gates of Puerto Rico are visual symbols of a historical trend that has lasted for centuries within unequal communities around the globe.  Gates have been an integral part of city design from Rome to Britain to the colonies of the New World . . . .  Most have been erected as private enclaves, in the name of protection from crime, locking out an increasingly complex city. . . .  In private communities, gating arranged by insiders keeps others out.

ZAIRE ZENIT DINZEY-FLORES, LOCKED IN, LOCKED OUT-GATED COMMUNITIES IN A PUERTO RICAN CITY 9-10 (University of Pennsylvania Press 2013).

This legislation allows municipalities to issue permits for controlled access regimes for traffic control in *public* streets.[18]  See Watchtower v. Sagardía de Jesús, 634 F.3d at 7 (1st Cir. 2011).  To obtain a permit, the residential community must create a residents association; propose a plan describing the permanent barriers and access arrangements; file a petition supported by at least three-quarters of the residential homeowners; and, assume the costs of installing and operating the plan.[19]  In January of 1989, the administration of Governor Rafael Hernández Colón enacted Regulation No. 20 titled "Regulation for Traffic Control and Public Use of Local

---

[18] The Controlled Access Law delegated permit issuing authority to municipalities under the Autonomous Municipalities Act. See Autonomous Municipalities Act, P.R. LAWS ANN. tit. 21, § 4054(p).

[19] The statute provides that:
Municipalities may grant permits to control motor vehicle traffic and the public use of public thoroughfares in pedestrian walkways, streets, urbanizations and public or private residential communities with a single access and exit point or with more than one access or exit point; but that none of their public thoroughfares are used to enter or leave another street, urbanization or community which has not requested access control.
…
Every authorization or permit for access control shall be issued subject to the conditions and requirements established in §§ 64-64h of this title and in the regulations adopted by the Puerto Rico Planning Board. The municipality and the Residents' Association shall be required to notify the residents of their efforts regarding the street closing process by certified mail.

Tit. 23, § 64.

Civil No. 04-1452 (GAG)

Streets." [20]   (Regulation No. 3843, January 5, 1989).   Said regulation is still in effect today. Regulation No. 20 provides for the inscription of these permits and municipal resolutions as a lien in the Property Registry.   See LUIS RIVERA RIVERA, DERECHO REGISTRAL INMOBILIARIO PUERTORRIQUEÑO 444 (Jurídica Editores, 3rd ed. 2012).   Likewise, the statute provides remedies for the imposition of sanctions or permit revocation for non-compliance or infractions with the provisions of the Controlled Access Law.[21]

---

[20] [The Controlled Access Law] authorizes the municipalities of Puerto Rico to grant authorizations and permits for controlling the transit of motor vehicles and the public use of the streets in developments and on public or private residential communities subject to a number of requirements and conditions. It further, directs that the Planning Board can adopt the regulations to regulate the granting of these authorizations and permits. [The Controlled Access Law's] principal objective is to promote greater community participation in the fight against crime by establishing the mechanisms for controlling motor vehicles transit and the pub1ic use of streets in the developments and public or private residential communities.

(Regulation No. 3483, Introduction).

[21] Any violation or noncompliance with the requirements established above shall bring about the automatic revocation of the authorization, except when the permit or authorization has been recorded in the Property Registry of Puerto Rico, as authorized in § 64d-1 of this title. The expenses of dismantling or removing the access control facilities shall be the responsibility of and be defrayed by the residents and proprietors of the urbanization or community concerned who favored the control of the access.

Once the permit or authorization is registered in the Property Registry of Puerto Rico the authorization may not be revoked, but the municipality where the development of segregation is located may impose sanctions, if there is a municipal ordinance to such effects, on any natural or juridical person who is liable for violating or failing to comply with the requirements established above. When the permit or authorization has been requested by the urbanizer, developer or constructor, they shall be liable for such noncompliance or infractions as long as not more than sixty-five percent [. . .]of the residences, lots or plots that make up the urbanization, subdivision or simple segregation, have been sold and delivered. When a council, board or residents' association has been constituted, it shall be liable for noncompliance or infraction of the provisions of § 64c of this title and shall keep the access control under its authority, to administer and maintain it.

The municipal governments of Puerto Rico shall have the power to approve those municipal ordinances that are needed to sanction violations of the provisions of §§ 64-64h of this title or the regulations promulgated hereunder to a maximum of two hundred and fifty dollars [. . .] for each violation. Each day that the same violation is committed shall be deemed as a separate violation.

Tit. 23, § 64d.

Civil No. 04-1452 (GAG)

Public streets within an urbanization with a controlled access regime, remain public property despite their enclosure.  The Puerto Rico Supreme Court acknowledged this in Caquías, where it addressed whether the implementation of a Controlled Access regime had the effect of privatizing public streets.

> The concept of access control implies that the public nature of residential streets must be preserved, while allowing residents to establish the means to control vehicular traffic and public use, thus watching after their own security and promoting a favorable environment for community coexistence.
>
> The delicate public policy behind the mentioned statute requires a harmonization between the residents' interest in their own security and welfare and the property rights and freedom of other persons, as well as those of residents opposed to access control or to its terms. Act 21, as amended, as well as the Puerto Rico Planning Board regulations and its implementing municipal ordinances, seek to harmonize these interests.

Caquías, 134 P.R. Dec. at 187 Offic. Trans. (P.R. 1993).

The Puerto Rico Supreme Court has also determined that the Controlled Access Law is constitutional "as long as in its application non-resident citizens are not restricted indiscriminately from accessing the public roads of the communities . . . ." Asociación Pro Control de Accesso Calle Maracaibo, Inc. v. Cardona Rodríguez, 144 P.R. Dec. 1, Offic. Trans. at 27-28 (P.R. 1997). Due to the public nature of these streets, they cannot be closed to the public, especially when those closures impede constitutionally protected activities such as freely exercising one's religious beliefs. See Maracaibo, P.R. Dec. at 38; Nieves v. A.M. Contractors, Inc., 166 P.R. Dec. 399, Offic. Trans. (P.R. 2005).  In Maracaibo, the Puerto Rico Supreme Court reasoned that:

> By constituting a delegation of power, the association will limit itself to the exercise of the delegated power. At the same time, the fact that the Access Control Act constitutes a delegation of State power implies that an individual or an association cannot, under the protection of a private conduct veil, jeopardize the individual rights guaranteed by the Constitution nor cause damage or nuisance to others through the exercise of the delegated power. *Insofar as to the usage of public property is being controlled, the authority granted to residents' associations is defined by the same parameters that limit the actions of the State. Consequently, if any*

28

Civil No. 04-1452 (GAG)

> *regulation approved by any residents' association violates constitutionally*
> *protected rights, the same will be considered null and void.*

144 P.R. Dec. at 27-8 (emphasis added).  Thus, it is patently clear that the Controlled Access Law

does not alter the public nature of the streets.  In <u>Caquías</u>, the Puerto Rico Supreme Court indeed

recognized this:

> The [Controlled Access Law] neither bars nor prohibits the public use of
> streets and sidewalks; rather, it allows some degree of control over its uses.
> The statute does not transfer or delegate to the residents the maintenance of
> the community's streets, sidewalks, or parks; on the contrary, it
> acknowledges the duty of public agencies and officers to continue
> providing essential services to the community. *This statute does not exactly*
> *seek to privatize streets and sidewalks.*

134 P.R. Dec. at 243.   The <u>Caquías</u> ruling was recently reaffirmed in <u>Watchtower v. Dorado</u>:

> We thus reiterate that the Access Control *Act did not have the effect of*
> *privatizing these public streets, since that was not a result of that*
> *legislation.* Note that the Access Control Act allowed municipalities to
> grant permits to control motor vehicle traffic and the public use of public
> roads. [P.R. Laws Ann. tit. 23, § 64.]  There is therefore, no question that
> public streets funded by the State are publicly owned and that the Access
> Control Act did not change, nor does it change, that legal situation.

192 P.R. Dec. at 93 n. 22; Slip Trans. Op., at 14 (emphasis added).  As will be discussed later on,

the Puerto Rico Supreme Court has never overturned <u>Caquías</u> or <u>Maracaibo</u>.

## b.  <u>Watchtower v. Municipality of Dorado</u>, 192 P.R. Dec. 73 (P.R. 2014)

*"Do the laws and Constitution of Puerto Rico allow for private residential roads?"*

(Docket Nos. 1173.)  In <u>Watchtower v. Municipality of Dorado</u>, the Puerto Rico Supreme Court

answered in the affirmative this Court's certified question of law, holding that "the current law [in

Puerto Rico] contemplates the existence of private residential streets." 192 P.R. Dec. 73, 97 (P.R.

2014), Slip Trans. Op., 1559-1 at 17.  The streets contemplated in Article 256 of the Civil Code,

P.R. LAWS ANN. tit. 31, § 1025, are of public nature as they "are funded and maintained by the

towns themselves and that are dedicated to public use." <u>Watchtower</u>, at 96, Slip Trans. Op., at 18.

Notwithstanding, private roads can exist under Puerto Rico law, so long as these that fall outside the scope of Article 256.

> After a review of legal rules and doctrinal sources, we see that while Article 256 of the Civil Code of Puerto Rico, indicates that local roads and streets are publicly owned, a logical interpretation of that principle leads us to conclude that this is mentioned in the context of their being maintained or funded by the State. As already stated, Article 256 of the Civil Code, provides that public use property includes "roads and ... streets ... funded by the towns themselves or with funds from the treasury of Puerto Rico." We could thus say that all streets in Puerto Rico that fall under this "specific category" established by law are public domain property, and therefore, cannot be private property. We therefore hold that residential streets that fall outside of the provisions of Article 256 are not so deemed, pursuant to the interpretation given to this article.

Id. at 96, Slip Trans. Op., at 17.   "[T]he current legal framework does not require that all residential roadways be dedicated to public use," referencing Puerto Rico Law 161 of December 1, 2009, known as the "Puerto Rico Permit Process Reform Act" P.R. LAWS ANN. tit. 23, §§ 9011, et seq.  Watchtower, at 96 n.23, Slip Trans. Op., at 18.  "Therefore, streets that are not transferred to a government entity remain outside of the scope of Article 256 of the Civil Code, not because of the holder of title, but because they do not fall under the specific type of streets listed therein." Id.

This Court now must decide how the Puerto Rico Supreme Court's ruling applies to the controversy at bar.   The parties have drastically opposing viewpoints as to the Supreme Court's holding, particularly as to the requirements that should be used to determine the nature of streets. Plaintiffs' principal argument is that "while the Puerto Rico Supreme Court recognized that private residential streets may exist, it did not invalidate all legal presumptions concerning the nature of streets." (Docket No. 1655 at 10.)   Plaintiffs posit the Puerto Rico Supreme Court "reaffirmed that urban development in Puerto Rico is subject to compliance with all applicable statutes and regulations and that it is the State's prerogative to determine what constitutes a public

Civil No. 04-1452 (GAG)

purpose." Id.  Consequently, Ponce's claim that the Puerto Rico Supreme Court's decision converted the streets in EGC into "private" ones, is misplaced.  Rather, the streets in EGC have been public, since inception, by virtue of law.

Ponce proposes a very different outcome.  It contends that the Puerto Rico Supreme Court ruling produced "a substantial change in law" that is now part of applicable substantive Commonwealth law.  (Docket No. 1682.)  Because now, private roads can exist in Puerto Rico, Ponce adduces that it can adequately raise its argument now that it "ha[s] the criteria to adequately ascertain whether a street is private or not." [22]  (Docket No. 1682 at 3.)   In light of the alleged change in law, Ponce contends the streets at EGC are private because these do not meet the public street criteria.   (Docket No. 1688.)

*i.  Adjudication on the merits is a matter for the District Court*

As a threshold matter, is Court is mindful that the Puerto Rico Supreme Court's ruling upon certification did not adjudicate the controversy regarding the nature of the streets of Brighton Country Club, nor the nature of the streets of any other gated community.  More so, the Puerto Rico Supreme Court did not adjudicate the validity of the permits issued by Dorado. "[T]he agreements between the Municipality of Dorado and the urbanization's developers  are not relevant to the particular decision before us. That is beyond our adjudicatory role, since we address  only  whether our laws allow this type of property to exist in a private setting." Watchtower, 192 P.R. Dec. at 83 n.11, Slip Trans. Op., at 6 n.11.  To determine the nature of the streets at EGC, the Court must hence evaluate the permits issued by the municipality.  "[T]he permit that the municipality grants must be interpreted and enforced according to the public

---

[22] Ponce had this opportunity before the Court certified the question.  In fact, it raised this argument as to three other urbanizations.  (See Docket Nos. 1110; 1117.)  Not to mention the fact that the Court, upon its own initiative, gave Ponce multiple opportunities to brief the private roads arguments as to those three urbanizations, considering that Dorado had also raised the same issue.

**Civil No. 04-1452 (GAG)**

nature of those roads."  See Watchtower v. Sagardía de Jesús, 634 F.3d at 10 (quoting Maracaibo, 144 P.R. Dec. at 28).

> *ii.   Legal framework in effect when the Puerto Rico Supreme Court*
> *addressed the issue of private roads*

Plaintiffs seek that this Court determine that although as of now can be privately owned, the Commonwealth Supreme Court "did not hold that all residential streets in Puerto Rico are private nor did its ruling alter the status of pre-existing streets."[23]  (Docket No. 1655 at 7.)  The Court agrees.   The laws and regulations analyzed by Puerto Rico Supreme Court upon certification were not in effect at the time BBC and EGC were developed, nor at the time the permits were issued by the respective municipalities.   Moreover, Plaintiffs are correct in the Puerto Rico Supreme Court ruling did not invalidate statutes and regulations, nor overrule any existing jurisprudence regarding gated developments in Puerto Rico.

> We can thereby logically conclude that a street is public because it has
> become the property of the government entity pursuant to the applicable
> legislation or urban regulation. Consequently, a street is public because it is
> under the domain and control of the State, regardless of the procedure
> whereby it was acquired. One of the ways in which the State can acquire a
> street is by requiring that streets be ceded to the state, to be dedicated to
> public use, as a condition for the approval of residential property.   In
> Watchtower, we acknowledged that *the current legal system* to date does
> not require that all residential roads be transferred to the municipalities for
> the purpose of dedicating them to public use, making reference to the
> regulations adopted under [Law] No. 161-2009.

---

[23] This was indeed acknowledged by Associate Justice Edgardo Rivera García in his concurring vote denying the Commonwealth's motion for reconsideration.

> Contrary to what it argues, our decision does not have the effect of validating or
> disapproving the legal transactions carried out between the [BCC] project and the
> Municipality of Dorado. In answering the certified question, we did not address the
> issue of whether the streets of [BCC] project are private or public under the
> regulations applicable at the time of its development. That was not a question before
> us, and therefore, we provide no answer thereto. Our adjudicative function was solely
> and exclusively limited to answering whether the legal framework in Puerto Rico
> permitted or enabled the existence of private residential streets. It is in that context
> that we issued the Court's Opinion.

Watchtower, at 350, Slip Trans. Op., at 11-12 (denying reconsideration) (Rivera Garcia, J., concurring vote).

Civil No. 04-1452 (GAG)

Watchtower v. Municipality of Dorado, 192 P.R. Dec. 339, 346 (P.R. 2015), Slip Trans. Op.,

Docket No. 1559-6 at 7 (denying reconsideration) (Rivera García, J., concurring vote) (emphasis

added).   In other words, the Puerto Rico Supreme Court's discussion did not address whether the

legal framework in effect at the time BCC and EGC were developed required that residential

roads be transferred to the municipalities for purposes of dedicating them to public use.

> iii.   Laws and Regulations in effect during the Watchtower v. Municipality of Dorado ruling

The Puerto Rico Supreme Court interpreted the Puerto Rico laws and regulations

regarding urban development and the Controlled Access Law as these were in effect between June

2013 and November 2014, when it addressed the certified issue.   The Puerto Rico "Permit

Management Office" (Spanish acronym "OGPe") was at that time, and still is, the agency in

charge of regulating and issuing permits for land use and development.   OGPe was created by

Puerto Rico Law 161 of December 1, 2009, known as the "Puerto Rico Permit Process Reform

Act," P.R. LAWS ANN. tit. 23, §§ 9011 et seq.[24]   By virtue of Law 161, the Planning Board

enacted Regulation No. 31, "Joint Regulation for Permits for Construction Work and Land Use"

(Regulation No. 7951,   November 2010) (Appendix 1 to this Opinion).   This regulation is

intended "to itemize the integrated permit system related to the development and use of lands, in

accordance to the public policy outlined in Law 161, by providing clear, objective and uniform

standards for the expeditious and efficient management of procedures.   It consolidates in a single

place all of the applicable rules, following a logical order and avoiding unnecessary duplications."

(Regulation No. 7951, Ch. 3, Rule 3.2.)   Said regulation established the requirements for permits

---

[24]   See Jaime F. Villeta García, Las Urbanizaciones bajo control de acceso, nuevos países independientes, 11 Rev. Clave  Rev. Estudios Críticos Der.  [Rev. Clave L. Rev. Critical Stud. L.] 271, 278-282 (2015).

**Civil No. 04-1452 (GAG)**

for residential urban developments, control access and vehicular traffic in residential streets, as provided by the Controlled Access Law. (Regulation No. 7951, Ch. 41.)

Planning Board Regulation No. 31 was subsequently amended by "Amendments to the Joint Regulations for Permits for Construction Work and Land Use (Joint Regulations), Planning Regulations No. 31" (Regulation No. 8068, October 2011) which revised certain provisions pertaining to residential urban developments. (Appendix 2 to this Opinion).  As of October 2011, *access* is defined as "***[p]ublic or private*** thoroughfare towards which the front of a lot or property is facing, which acts as the entrance or exit to the lot or property or body of water, for pedestrians, vehicles or both."[25]   (Regulation No. 8068, Ch. 4) (Emphasis added).  Moreover, in regards to land use for residential urban developments, Regulation 31 provides:

> **Chapter 17:        Residential Urban Developments**
>
> **General Provisions:**
>
> The purpose of this chapter is to establish guidelines and the tightest coordination between the developer and the entities responsible for the necessary infrastructure for the proposed use, starting from the earliest stages that shall rule the authorization for lot division (segregations) and urban development, in order to assure that the project internalizes the costs for providing the infrastructure inherent to its functioning without affecting the quality or quantity of service available to the community or sector.

(Regulation No. 7951, Ch. 17, § 17.1).

> **Section 17.3.2        Accesses:**
>
> Any new lot to be formed shall have access through a duly registered ***public street or a private street*** that is dedicated as access
> In the case of urban developments, new residential lots shall only have access to local streets.
> In lots where the back yard is adjacent to a thoroughfare with high traffic volume, it will be required that a solid, fixed and permanent fence be set

---

[25] Before the 2011 amendment, Regulation No. 31, defined *access* as "Public thoroughfare towards which the front of a lot or property is facing, which acts as the entrance or exit to the lot or property or body of water, for pedestrians, vehicles or both."   (Regulation No. 7951, Ch. 4.7.)

along the boundary, which shall never be able to provide access to said thoroughfare.

New residential lots with a surface area of less than one (1) cuerda shall not be allowed have access to main streets, avenues or the marginal of an avenue or expressway.

(Regulation No. 8068, Ch. 17, § 17.3.2) (emphasis added).  Before the 2011 amendments, the provision only referred to "public" streets.  See Regulation No. 7951 Ch. 17, § 17.1.

### Section 17.6.5      Requirements for Granting Land Use Permit:

For access through a public thoroughfare, authorization from the Municipal Government must be requested accepting the street(s) after its(their) construction. This shall be done by means of a public document to be presented at the Property Registry together with the registry plat. To do this, the corresponding public assignment document(s) on behalf of the municipality must be provided.

For access through a ***private*** thoroughfare, the private access facility(ies) or plot(s) shall be dedicated by means of a public document for said purpose, and title shall belong to one of the following:

> 1) The residents association or the board of holders, as applicable, in the case of a residential urban development with single family lots, or with several lots in the case of urban developments, condominiums or multifamily projects.

> 2) The developer and/or its successors, assignees, or an association or other entity constituted by […]

(Regulation No. 8068, Ch. 17, § 17.6.5) (emphasis added).  Notably, this provision adds and allows access through private roads.

### c.   The Watchtower Aftermath: Streets in Puerto Rico may be of public *or* private nature

Ponce interprets the Puerto Rico Supreme Court's ruling as constituting a "substantial change" to the until then applicable substantive law,   to wit, that there now exist two distinct categories of streets: public and private.  This assumption is clearly erroneous.  The high Court's opinion did not create two separate categories for streets.  Rather, it clarified that the nature of the property is contingent upon the property's eligibility of ownership.  The Supreme Court explained

Civil No. 04-1452 (GAG)

that, under Puerto Rico law, private streets are not prohibited.  Public streets are those provided

by Article 256, and private streets that are any others that may fall outside the scope of said

article..  "[A]ll streets in  Puerto Rico that fall under this 'specific category' are established by

law are public domain property, and therefore, cannot be private property.  We therefore hold

that residential streets that fall  outside of the provisions of Article 256 are not so deemed,

pursuant to the interpretation given to  this article."   Watchtower, 192 P.R. Dec. at 96, Slip Trans.

Op., at 17.  The Supreme Court further explained that:

> In the past, we have interpreted [Article 256] in cases involving the Access
> Control Act. See, e.g., Maracaibo; Caquías. More to the point, we have
> explained whether access restrictions allowed by such legislation had the
> effect of converting public streets into private access roadways.
>
> Thus, for instance, in Caquías, the Municipality of San Juan authorized the
> closure of municipal roadways that provided access to the Mansiones de
> Río Piedras urbanization. There, we alluded to Article 256 of the Civil
> Code, pointing out that under our laws, *streets are public use property*.  On
> the other hand, in Maracaibo, we reviewed constitutional claims in
> connection with Article VI, Section 9, of our Constitution, which requires
> the State to *use public funds and property solely for public purposes*. We
> pointed out that
>
> > [i]n this context, streets are public use and domain property
> > regardless of the jurisdiction wherein they may be found,
> > whether it be state or municipal. This public character of the
> > streets derives from our Civil Code, Articles 255 and 256.
>
> We see that these cases—as opposed to [BCC]—were decided in the
> context of urbanizations whose streets were municipal and funded by
> public funds. Naturally, then, "access  control" left unaltered the public
> nature of the streets. Caquías.  Note, then, that the foregoing shows that
> we have always interpreted Article 256 of the Code to mean that the
> streets therein mentioned are supported by public funds.

Id. at 92-4, Slip Trans. Op., at 14-15 (footnotes and internal citations omitted) (emphasis added).

## VI.   Discussion: Estancias del Golf Club

The Court now turns to address the parties' arguments in accord with the aforementioned applicable law.  At the outset, it will summarize the parties' respective arguments as to whether the streets of EGC are of a public or private nature.

### a.   Ponce's theory:   The public purpose and use of public funds are the determining factors

Ponce sustains that the Puerto Rico Supreme Court's ruling clearly established that the street's dedication to public use, i.e., the purpose of the street, is the determining factor as to whether the same is public or private in nature.  (Docket No. 1635 at 7-8.)  Ponce reasons "[t]he crucial element [is] whether [the streets] are funded by the towns themselves, with funds from the treasury of Puerto Rico or with private funds." Id.  Consequently, Ponce asks the Court to take into account the factual background and construction history of the streets at EGC.

Ponce argues that the streets of EGC are private because it has yet to accept the same from the developer. Thus, the transfer of the streets has not been materialized.[26]  (Docket No. 1635 at 8-9.)  It argues to the fact that the maintenance and repair of EGC's streets is funded by private funds from the residents' association, and not public funds of the commonwealth nor municipal government.  (Docket No. 1635 at 9.)  Accordingly, "pursuant to the Puerto Rico Supreme Court's decision, the streets of Estancias del Golf are not public [and hence, private] because they fall outside the specific type of streets listed in Article 256 of the Civil Code." Id.  Furthermore, "the imposition of conditions by the Municipality for the approval of the Estancias residential development did not, by itself, convey a public nature to the streets of Estancias." (Docket No. 1682 at 5.)

---

[26] Under this premise, the transfer itself will likely never take place, given that Ven Lour is an insolvent and inoperative entity, and has so been for over a decade.

1        Ponce points to the fact that besides Resolution 73, there is no evidence that the streets of

2  EGC were indeed transferred to the Municipality.  (Ponce's SUF, Docket No. 1635-1 ¶ 5.)  In

3  support of this, it provides a certification of the Municipal Public Works Division dated October

4  6, 2015, acknowledging the same.[27]  (Docket No. 1654-2.)  "Consequently, Ponce sustains that

5  "[i]t is evident that the conveyance of the streets to Ponce was always conditioned upon the

6  transferring of the urbanization's street to the Municipality of Ponce."  Id.

7        Plaintiffs, in response, argue that there is no legal authority to support Ponce's argument

8  that a delay in transferring the title of public streets 'privatizes' or alters the intended status of the

9  streets destined for public use.   (Docket No. 1655 at 13.)  Thus, the Court should reject Ponce's

10  claim that any street not transferred to the government is per se automatically deemed a private

11  street.  Id.  Accordingly, the streets of EGC are public streets by virtue of law.  These were

12  conveyed to the Municipality by Resolution No. 73, and the several resolutions issued by

13  pertinent state and municipal agencies.  From the very outset, EGC was intended and designed to

14  have public streets and that the approval of its  urban development was conditioned to the transfer

15  of the streets to the municipality.  Id.  In particular, Plaintiffs point out that in October 2002, the

16  Ponce Municipal Legislature approved Ven Lour's request to convey the streets to the

17  Municipality via Resolution No. 73.  (Docket No. 1630.)  Further, the record evidence itself —the

18  construction permit, three ARPE permits, the controlled access permit, Resolution No. 73 and

---

20        [27] Plaintiffs object to Ponce's statement at paragraph five, arguing that the record citation does not

21  support the assertion. (Docket No. 1655-1 at 15 ¶ 5.)  Plaintiffs posit that "[t]he Certification of the Municipal Public Works Division dated October 6, 2015, actually states: 'in our files there is no addition[al] evidence in relation to the transfer or assignment of the streets excluded in Ordinance No. 73.'"  Id.  Further, Plaintiffs note

22  that, according to the text of Resolution No. 73 of October 2002, five streets (Streets D-2, D-3, D-4, D-5, and D-7) were excluded from this ordinance because they were not yet built or were only partially built."  Id. (citing Docket No. 1630-2 at 2; 1617-3 at 22.)  Moreover, in contrast to Ponce's representations, the above-argument is

23  contradicted by the February 2008 Resolution of the Municipality of Ponce's Permit Office, that evidences the approval of the partial segregation of  the remaining streets excluded from Resolution No. 73, namely, 'Streets D-2, D-3, D-4, D-5, and D-7 of Urbanization Estancias del Golf Club.  Id. (quoting (Docket No. 1655-7)

24  ("Resolution February 2008").

**Civil No. 04-1452 (GAG)**

1  three resolutions approved by the municipal permit office— demonstrates that the Municipality

2  imposed multiple conditions so that EGC indeed transfer its the streets to the municipality.  Thus,

3  the prolonged delay in conveying the streets to Ponce does not now "privatize" its streets.

4       Plaintiffs also point to a very important factor, that is, that originally the developer

5  notified Ponce of its intent to transfer to it the streets at issue.  Upon Ven Lour's initiative, Ponce

6  inspected and later approved the transfer of the streets, noting that "approval of these streets is

7  useful and convenient for public use."   Subsequently, the municipal legislature approved the

8  acceptance of the streets (Resolution No. 73).  (Docket No. 1655.)  Accordingly, irrespective

9  whether the actual transfer of the streets took place, the municipal actions evince that the streets

10  of EGC are public streets.  (Docket No. 1655.)

11       **b.  Plaintiffs' theory:  Urban planning and development is a prerogative of
           the State**

12       Plaintiffs contend that the Commonwealth has complete authority to determine the use of

13  land, urban development and planning. This includes the power to dedicate property to public use

14  by legislative declaration or administrative acts, such as the approval for construction permits.

15  (Docket No. 1655 at 9.)  The Commonwealth, thus, may legitimately determine what constitutes

16  *public purpose* and, thus, public funding per se is not the decisive factor.  (Docket No. 1655.)

17  Therefore, "[n]otwithstanding the possibility that private streets now may exist in Puerto Rico, the

18  Supreme Court decision highlights that *urban development remains fully subject to compliance*

19  *with all applicable statutes and regulations*."  (Docket No. 1655 at 9.)

20       "[T]he Legislative Assembly of Puerto Rico has full power to determine what constitutes a

21  public purpose. . . .  an urban development is subject to regulation deemed appropriate by the

22  state, since the right to develop is not absolute and may be subject to conditions." Watchtower, at

23  90, Slip Trans. Op., at 18.

24

**Civil No. 04-1452 (GAG)**

> [P]ublic use or domain property is not dependent on who the initial owner is. Rather, the Puerto Rico Legislature, in the plenary exercise of its power by reason of state, may determine that a certain property be dedicated to public use. This is all the more the case since we have repeatedly acknowledged that urban development is not an absolute right, but is conditioned on any regulations deemed appropriate by the State.

> In other words, the State has the power to decide that residential streets be ceded to the government entity to be part of public property.  In any action to the contrary it must then weigh any possible consequences and legislate any laws deemed in order.

Id. at 346-47, Slip Trans. Op., at 7-8 (denying reconsideration) (Rivera García, J., concurring vote).

> [T]he recognition of private streets under our laws should not in any way undermine the State's exercise of it power and authority in connection with land use, permits, construction works, and other inherently public functions. Much less should it shield these communities from the state's authority to act in the public's interest by the mere fact of their streets being private property. The socioeconomic animosity intrinsic in the recognition of private streets not only fosters crime, inequity and discrimination, but it encourages the secession of groups and communities from the country's political system, and the exclusion of groups that lack the economic resources to be a part of these enclaves. It is an unprecedented circumvention of public order, and disturbs the workings of a democratic constitutional state based on citizen participation and social integration.

Compare e.g., Id. at 367; Slip Trans Op. at Docket No. 1559-8 at 13 (Rodríguez Rodríguez, J., dissenting vote).

### i. Streets in Puerto Rico

Article 255 of the Civil Code establishes that things of public domain are "[t]hose intended for public use, as roads, canals, rivers, streams, and others of a like nature."  P.R. LAWS ANN. tit. 31, § 1024.  Moreover, Article 256 of the Civil Code provides that:

> The property of public use in Puerto Rico and the towns thereof comprises the Commonwealth and local roads, the squares, streets, fountains and public waters, walks, and public works for general use, paid for by the said towns or from the Treasury of Puerto Rico.

> All other property, possessed by either the Commonwealth of Puerto Rico or the municipalities thereof, is common property for the use of the general and municipal governments, and shall be governed by the provisions of this Code. [28]

P.R. LAWS ANN. tit. 31, § 1025.  Although Article 256 of the Civil Code identifies the public nature of streets, there is no statutory provision dictating *in rem* rights over streets.  Watchtower, 192 P.R. Dec. at 91-92, Slip Trans. Op. at 13.  Article 274 of the Civil Code classifies property by its susceptibility to acquisition.  It establishes two categories: common goods that can never be privately owned, and:

> other things, on the contrary, which, although by their nature are susceptible of private ownership, lose this quality as a consequence of their being applied for public purposes inconsistent with private ownership, but which may acquire their former condition so soon as they cease to be applied to that purpose; such are the lands used for highroads, streets and public squares.

P.R. LAWS ANN. tit. 31, § 1082.  This second category provides for a change in acquisition eligibility contingent upon the use and public purpose that the property serves.  Such change in status occurs by the property's dedication to public use.

### ii.   Dedication to public use

Different types of public domain property exist: (1) property dedicated to public use; (2) the public use property mentioned in Article 256; and (3) lands that are dedicated to public use. Watchtower, at 89, Slip Trans. Op., at 12.  "[I]n each case, what defines these types of property is **the public use to which they are dedicated.**"  Id.  (emphasis in original).  José Vélez Torres, Puerto Rico civil law commentator notes that:

> [P]ublic domain property need not belong to the State or its agencies.  In this regard, what characterizes the property is not possession or ownership

---

[28] In Watchtower, Associate Justice Luis Estrella Martínez issued a dissenting opinion in which he states his belief that, under Puerto Rico Civil law, streets have always been  classified as public domain property, that is, property dedicated to general public use. 192 P.R. Dec. at 133-34 Slip Trans. Op., Docket No. 1559-4 at 10 (Estrella Martínez, J., dissenting Op.).

Civil No. 04-1452 (GAG)

> in itself.  Likewise**,** the fact that property is publicly owned does not depend on its physical or geological nature.  In each case, the determining factor is the **purpose** of the property, that is, its dedication to general public use.  Consequently, property dedicated or destined for a public purpose or interest would acquire the legal classification of public domain property, regardless who owns it, and of the nature of the property.

Id. (citing San Gerónimo Caribe Project v. E.L.A. I, 174 P.R. Dec. 518, 564-66 (P.R. 2008); Figueroa v. Municipio, 98 P.R. Dec. 534, 563 (P.R. 1970) (emphasis in original).  In San Gerónimo, the Court held that dedication of property for a public purpose occurs via legislative action ("legislative dedication"), or by administrative action of the executive branch, when it has the authority to regulate.  San Gerónimo, 174 P.R. Dec. at 565.

> . . . the public domain classification may depend exclusively on the very nature of the property itself, without the need for additional action on the part of the sovereign, as would be the case with rivers and torrents, since their dedication to public use is generally defined under the law in relation to certain physical or natural circumstances. In other instances, dedication to public use results from the action of the sovereign in building or setting up real property for public purposes, as for instance in the case of state roads and municipal cemeteries.

Id. (quoting San Gerónimo, 174 P.R. Dec. at 565.)  "[Dedication to public use] may be as little as a declaration by the legislature, as with the Civil Code . . . . It may also take place through administrative acts carried out by the State under statutory authorization (e.g., construction of a public square or a cemetery)."  Id. at 90, Slip Trans. Op., at 13.  In regards to administrative dedication,

> Spanish doctrine distinguishes between 'express administrative dedication to public use' and 'constructive administrative dedication to public use.  In this regard, *urban planning approval is deemed a constructive dedication to public use.*
>
> We could therefore conclude that after becoming aware of the public need, the legislature establishes the goals that form the basis for dedicating to public use a certain category of property.
>
> According to doctrine, legislative dedication to public use is the only procedure where by entire categories of property may become public property.

Watchtower, 192 P.R. Dec. at 90 n.19; Slip Trans. Op., at 13 n.19 (internal citations omitted) (emphasis provided).

Public property dedication may also be undone. San Gerónimo, 174 P.R. Dec. at 565. When this occurs, the property becomes eligible for private acquisition. This occurs when the public use ends. It is important to note that the undoing of dedication of property requires specific action "by statute, by an administrative act, or by changes in the nature of the property that exclude it from its category, a change in ownership status comes about."[29] Id. at 566.

### c.   The streets at Estancias del Golf Club

The parties' competing contentions are as follow. Plaintiffs argue that it is the prerogative of the state –not the homeowners, developer nor municipality— to determine what constitutes a "public purpose" and what conditions must be fulfilled to engage in urban development. (Docket No. 1655 at 8-9). "To hold otherwise, would foment noncompliance with urban planning requirements as it would, in effect, suggest that the conditions imposed by the government are not legally binding and that developers may feel free to disregard these conditions if they so desire." Id. at 9. More so, the imposition of conditions by Ponce did not preempt the conveyance of the streets of EGC for public use. Thus, the mere possibility of the existence of private streets does not absolve developer or community from its obligation to comply with other requirements

---

[29] In Watchtower, Associate Justice Estrella Martínez further discusses the dedication doctrine, citing Spanish Civil Law commentator Lacruz Berjedo:

> [u]ndoing the dedication to public use changes the status of the property, [because it] ceases to be public and reenters commerce. [This, however,] does not necessarily involve a change of ownership, since the property in question may still be part of the public entity's private property.
> Our previous court opinions state that this act of undoing a dedication to public use may be express or constructive. However, to be valid, the actor must have proper authority to carry out the act. More importantly, we reiterate that the key is cessation of the public purpose to which the property had been dedicated.

192 P.R. Dec. at 132, Slip Trans. Op., at 8 (Estrella Martínez, J., dissenting Op.) (alterations in original) (internal quotations omitted).

Civil No. 04-1452 (GAG)

imposed by law, such as the requirement that all parcels of land have access to public roads so that none is enclaved.  (Docket 1655 at 8) (P.R. LAWS ANN. tit. 31, § 1731).  Article 93 of Puerto Rico's Mortgage Law requires that lots set aside for common or public use be registered before any other segregation.  P.R. LAWS ANN tit. 31, § 2314.

Ponce's argument is simpler and rests in the supposition that the actual transfer of the streets of EGC is essential and crucial in order for these to be destined for public use.

> i.  *Laws and Regulations applicable to the development projects of BCC and EGC*

As previously discussed, the Puerto Rico Supreme Court in Watchtower did not invalidate existing statutes, case law and legal presumptions regarding streets and urban developments in Puerto Rico.  Further, it did not interpret or consider those laws and regulations in effect during the development and permit-issuing phase of EGC.

According to the official municipal records submitted as evidence, EGC's permit history with the Municipality of Ponce dates back to 1992.  The earliest Municipal Resolution is Resolution No. 47, in which Ponce approved and endorsed the name to be given to the development.   Thereafter, in the year 2002 the Municipal Legislature approved Resolution No. 73, accepting and ordering the transfer of the streets from Ven Lour to Ponce.  However, it was not until June 2006, by way of Ordinance No. 81, that Ponce issued a controlled access permit in favor of the urbanization, upon request of a group of residents.

Having outlined the timeline of the relevant permit history, the Court turns to review the relevant laws and regulations in effect at the time the permits were issued.  When Ponce's Municipal Legislature approved Ordinance No. 81 the regulation for Controlled Access permits was "Regulation No. 20, Regulation for Traffic Control and Public Use of Local Streets," (Regulation No. 3843, January 20, 1989).   The same provided "the necessary norms and

Civil No. 04-1452 (GAG)

procedures for obtaining the permits and authorizations for the control of motor vehicles traffic and the public use of the streets in developments and communities, in accordance with the provisions of [the Controlled Access Law] of May 20, 1987, as amended."  (Regulation No. 3483 §1.03).  *Access* is defined in said regulation as a "*[p]ublic way* contiguous to a lot or property, serving as the entrance and exit to the lot or property."  Id. § 2.02 (emphasis ours).

The administrative authority regarding urban development and land use, at the time of the approval of the transfer of the streets by virtue of Resolution No. 73, was "Planning Regulation No. 3, Lot Classification and Subdivision Regulations."  (Regulation No. 4867, January 1993) (Appendix 3 to this Opinion).  The same provides:

**Section 2: Definitions**

Access: A public roadway that a piece of land or property faces and that provides such piece of land or property a way for pedestrians, vehicles, or both, to enter and exit.

Subdivision [Urbanization]: All segregation, division or subdivision of a piece of land that, considering the work being done to create lots, is not included in the definition of "Simple Lot Classification" as defined in these Regulations, and will further include the development of any piece of land for the construction of any building or buildings with eleven (11) or more housing units; the development of facilities for commercial, industrial, institutional, or recreational use not exceeding two thousand (2,000) square meters of construction . . . .

(Regulation No. 4867, § 2.)

**Section 7: Residential Subdivisions**

General Provision: The main purpose of a residential subdivision shall be to prepare the terrain in order to settle safe, peaceful, and attractive residential communities of different sizes and different intensities.

Access:  Every new lot to be formed shall have access through a duly registered public street. In the case of subdivisions [urbanizations], the new residential lots shall have access only to local streets. New residential lots with an extension of less than one (1) cuerda shall not be allowed to have access to principal streets, avenues, or access roads to avenues and expressways.

(Regulation No. 4867, §§ 7.1-7.2.)

Civil No. 04-1452 (GAG)

Contrary to the current state of law as explained by the Supreme Court in Watchtower, the applicable legal framework at the time EGC became a gated community, as well as before, did not provide for, much less recognize, public streets in residential urban developments.  Thus, the law and regulations applicable to EGC required the transfer of its streets to Ponce upon its development.  See MARGARITA E. GARCÍA CÁRDENAS, DERECHO DE URBANIZACIONES: SERVIDUMBRES EN EQUIDAD, CONTROLES DE ACCESO E INSTALACIONES VECINALES 80, n. 177 (Alberto Medina Carrero ed., 2010) (discussing that pursuant to Article 93 of the Mortgage law, P.R. LAWS ANN tit. 31, § 2314, in cases of urban development, lots destined for public or common use must be segregated and recorded in the Property Registry prior to any other segregation). (Appendix 4 to this Opinion).  Moreover, the Commonwealth's Supreme Court ruling in Watchtower did not invalidate the then existing legal requirements applicable to the development and gating of EGC.

As discussed earlier, it is via legislative dedication that entire categories of public property are created.  By virtue of law property acquires its public purpose and is destined for public use.  Specific ulterior acts are thus, not required.  The dedication of the streets of EGC was never conditioned to the actual transfer of these to the Municipality.  Rather, by virtue of law the streets of EGC are public, because since their inception these were destined for public use by virtue of the laws and regulations in effect during the development phase of the urbanization.  This is also evinced by EGC's urban planning permit approved by the Ponce Municipal Legislature and Board.

In light of the preceding, Ponce's only avenue to prevail is to prove that the dedication of the streets of EGC was undone, by specific action.  The record evidence is completely devoid of any act or event that could represent the annulment of the street's public purpose.  To the contrary, the evidence demonstrates the complete opposite.  The specific legislative and administrative acts

Civil No. 04-1452 (GAG)

that took place reflect that the streets of EGC were, at all times, governed by the scheme of laws and regulations applicable to public use.[30]  In sum, the Court finds that the streets of EGC are public in nature, and thus, the remedial scheme established by this Court is applicable to the same.

The Court's ruling today, which takes into account Commonwealth law, will indeed have implications prospectively, specifically as to gated communities that pursuant to <u>Watchtower v. Municipality of Dorado</u>, indeed have private roads.

> For instance, how will fundamental constitutional rights be guaranteed in these new communities, for residents as well as nonresidents? Upon delegation of inherently public functions, will the residents' associations be deemed state actors? How will the state prevent discriminatory or arbitrary actions by the associations? Will the associations be able to prevent a resident from using one of the private streets within the urbanization for failing to pay fees or violate some of the rules in their charter? Will the residents be able to make improvements to these private streets that actually interfere with land use plans, storm water runoff, and environmental conservation? How will the State deal with residents' actions that affect the conservation of archeological and natural resources found within a certain urbanization? Will the residents' association be solely responsible for providing and maintaining essential services such as potable water and electricity, trash pickup, and paving? What powers will the Puerto Rico Police have to exercise its authority and perform its duties within the property of a private urbanization? What tax schemes will apply to this new type of private property? Will the residents be able to claim municipal tax exemptions based on the argument that they are subsidizing the services provided within the urbanization with their fees? Who will be civilly liable for accidents occurring on these private streets? Will a residents' association be able to alienate a private street? What will happen if a mortgagee decides to foreclose on the mortgaged property, which consists of a private street? Can residents then be charged for access? How will access to beaches, adjacent streets, and other public use property be

---

[30] The several the permits issued in favor of EGC evidence the public use of its streets: Resolution No. 47, endorsing the name Estancias del Golf Club; Resolution No. 214, authorizing the Municipality of Ponce to enter into a contract with Ven Lour, for the construction of a storm drainage system for EGC and its surrounding areas; Resolution No. 73, authorizing the mayor to accept the transfer of streets in EGC from Ven Lour;  Ordinance No. 81, granting a petition by a group of residents of EGC to implement a controlled access regime; Building Permit" and "Use Permit" issued to the residents association of EGC for the construction of a controlled access system; and, Resolution June 1999, Resolution January 2002, and Resolution January 2002 authorizing the parceling of lots for the streets of EGC.  More so, as candidly admitted by counsel for EGC at oral argument, the Municipality of Ponce to this day continues to collect garbage disposal within the gated community.

Civil No. 04-1452 (GAG)

> guaranteed to citizens when the only access is through a private street?
> May those who wish to use these streets be charged a toll?

Watchtower, 192 P.R. Dec. at 366; Slip Trans. Op., at 13 (denying reconsideration) (Rodríguez Rodríguez, J., dissenting vote).  The Court indeed shares the same concerns as Associate Justice Rodríguez.  However, under our doctrine of separation of powers, it is the role of the legislative branch to change or amend the laws of Puerto Rico.[31]

For all the reasons discussed above, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment at Docket No. 1630 as well as its Motion for Permanent Injunction at Docket No. 1516 and **DENIES** Ponce's Motion for Summary Judgment at Docket No. 1635.

### VII.    Some final considerations

As a final note, the Court turns to EGC's contradicting conduct throughout this litigation, which it considers particularly appalling.

> **When gates divide and segment a city, the purpose of a city has been lost. . . .   Neighbors seldom encounter the street or each other.  The lifestyle of Ponce is a contradiction in terms –non-urban isolation amid ultra-urban complexity.**

ZAIRE ZENIT DINZEY-FLORES, LOCKED IN, LOCKED OUT-GATED COMMUNITIES IN A PUERTO RICAN CITY, at 27.[32]

---

[31] In reaction to the Supreme Court's ruling in Watchtower v. Mun. of Dorado, the Senate Judiciary Committee of the Commonwealth Legislature drafted a bill to amend Articles 255 and 256 of the Civil Code to clarify that streets in Puerto Rico are, and always have been, of public nature, and thus are not susceptible of private ownership except if its dedication to public use is undone.  P. del S. 1342, Comisión de lo Jurídico [Rep. Jud. Comm.] 17th Leg. Assemb. (as reported by the Judiciary Committee on March 25, 2015).

As part of the committee's investigation, the Puerto Rico Mayor's Association, as well as Law Professor Margarita García Cárdenas submitted written statements in support of the proposed bill.  However, the Mayor's Federation and the Puerto Rico Association of House Constructors issued written statements in opposition.  After conducting the investigation, the Senate Judicial Committee issued a positive report recommending the approval of the proposed bill.  See Sen. Miguel Pereira Castillo, *Informe Positivo sobre el P. del S. 1342* [Rep. Jud. Comm.], 17th Leg. Assemb. S. (June 22, 2016).

[32] Dinzey-Flores' sociological study *vis a vis* that of the First Circuit and this Court from a Constitutional First Amendment perspective of gated communities in Ponce is a must read for all: the Court

1      Up to 2012, the residents of EGC went above and beyond to complete the last steps of the

2 transfer of their streets to the Municipality.  Suddenly, they took a one hundred eighty degree turn

3 and demanded their streets now be private, when it became convenient to them.  This Court will

4 not allow Plaintiffs' First Amendment protected activity to be held hostage by the whim of

5 residents associations within gated communities.

6      "[Streets] have been dedicated to the use of the inhabitants of the city, and each and every

7 one of them, from the Governor in the Palace to the beggar in the gutter, has the right to their free

8 and continual enjoyment."  <u>Saldaña et al. v. Concejo Mun. de San Juan et al.</u>, 15 P.R. Dec. 37, 48-9

9 (P.R. 1909) (emphasis added).  Jehovah's Witnesses, just like every other civilian and religious

10 group, have the constitutional right to journey public streets of Puerto Rico.  Throughout much of

11 this litigation, Jehovah's Witnesses' First Amendment rights have been put on hold because of a

12 dispute between Ponce and EGC.  This situation neither involved Plaintiffs nor can it be attributed

13 to them.  It has become quite common for urbanizations and some of their residents to believe it is

14 unacceptable to have non-residents walk the streets within their gated communities.  This

15 constitutes a discriminatory pattern that our Constitution forbids.

16           The public and private housing gates of Puerto Rico are visual symbols of a

17           historical trend that has lasted for centuries within unequal communities around the globe.  Gates have been an integral part of city design from Rome to Britain to the colonies of the New World . . . .  Most have been

18           erected as private enclaves, in the name of protection from crime, locking out an increasingly complex city. . . .  In private communities, gating

19           arranged by insiders keeps others out.

20 Z<small>AIRE</small> Z<small>ENIT</small> D<small>INZEY</small>-F<small>LORES</small>, <u>L<small>OCKED</small> <small>IN,</small> L<small>OCKED</small> <small>OUT</small></u>, at 9-10.

21           As gates and walls establish and reinforce community boundaries and

22           social permissions, they distribute power; they warn and discipline city navigators; and they shape and sustain race, class and gender inequality and

23

24 (which already owns copy of the book), those involved in municipal governments in Puerto Rico, Jehovah's Witnesses and any other religious and non-religious groups who exercise their First Amendment constitutionally-protected rights.

Civil No. 04-1452 (GAG)

> exclusion, determining and exemplifying a social hierarchy.   [R]ace prejudice is rooted in a sense of group position, *maintained by collectively rearticulating a sense of superiority that demeans a subordinate group, justifying social exclusion, solidifying claims to privilege, and sustaining fears and suspicion of that subordinate group.*

Id. at 21 (emphasis added).  Community gates in Puerto Rico narrow the concept of community and of individual through decisions about group social worth and social threat, about who is redeemable and who is dispensable, about who is "good" and allowable, and about who is "bad" and made to "go away."  Id. at 72.

## VIII.   Conclusion

Immediately upon the issuance of this order, EGC shall grant access to Jehovah's Witnesses' to freely exercise their First Amendment rights within its streets.  The Municipality of Ponce shall continue to ensure that Plaintiffs' constitutional rights are protected.  Non-compliance with this order will result in the imposition of sanctions.  The Court may also take extreme measures to guarantee compliance, including but not limited to, ordering Ponce Municipal Police or Puerto Rico Police to forcibly open the gates of EGC, if warranted.

**SO ORDERED.**

In San Juan, Puerto Rico this 6th day of July, 2016.

> *s/ Gustavo A. Gelpí*
> GUSTAVO A. GELPI
> United States District Judge[i]

---

[i] The Court wishes to recognize and commend Circuit Satellite Librarian Ana Milagros Rodríguez and Assistant Librarian José Luis Rodríguez for their assistance in the research of this Opinion and Order.  The same has been most valuable in this matter, as well as in countless other matters over the years.